The Standard Fruit Product Company, an Ohio Corporation v. Commissioner.
Standard Fruit Prod. Co. v. Commissioner
Docket No. 17628.
United States Tax Court
1949 Tax Ct. Memo LEXIS 103; 8 T.C.M. (CCH) 733; T.C.M. (RIA) 49207; August 22, 1949
Roy G. Holmes, Esq., 900 Traction Bldg., Cincinnati 2, Ohio, for the petitioner. J. O. Durkan, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies for the calendar years 1943 and 1944 in petitioner's income tax, declared value excess profits tax, and excess profits tax, and imposed penalties for delinquent filing of returns for 1943 and for failure to file an excess profits tax return for 1944, as follows: Year
Tax
Deficiency
Penalty
1943
Declared value excess
profits
$ 4,322.15
$ 216.11
Excess profits tax
47,098.07
2,354.90
1944
Income tax
$ 2,454.24
Declared value excess
profits
1,034.69
Excess profits tax
39,172.46
9,793.12
The first issue is whether respondent erred (a) in attributing to petitioner the income allegedly earned by a partnership known as Riverview Sales Company for the taxable years 1943 and 1944, in accordance with the provisions of section 22 (a) of the Internal Revenue Code, or (b) in allocating the net income of Riverview *105 Sales Company to petitioner for the years 1943 and 1944 in accordance with the provisions of section 45 of the Internal Revenue Code. The second issue pertains to deductions totaling $1,089.38 in 1943 and $5,956.75 in 1944, claimed by petitioner as deductible items of expense incident to the upkeep and maintenance of its business premise and equipment, which were disallowed by the Commissioner in accordance with the provisions of section 24 (a) (2) of the Internal Revenue Code. An additional claim of deduction in the amount of $1,950, representing the purchase of an interest in property during 1944, was abandoned at trial. The third issue is whether the Commissioner erred in asserting penalties for the taxable years 1943 and 1944 in accordance with the provisions of section 291 (a) of the Internal Revenue Code. Those returns filed by petitioner were filed with the collector for the first district of Ohio. Findings of Fact The petitioner, the Standard Fruit Product Company, hereinafter referred to as Standard, was incorporated under the laws of the State of Ohio in 1915 to assume the business of its predecessor *106 company. Standard manufactures and sells fruit, nut and chocolate products such as are used by the soda fountain and ice cream trade. Sales are made in approximately thirty of the forty-eight states under the brand name of "Sugarnut." The reputation of Standard's products in the trade has been and is excellent. During 1943 and 1944, the taxable years in question, Standard's outstanding capital stock consisted of sixty-five shares held as follows: Shares
Frank H. Payne, Sr.
43
Ina W. Payne, his wife
1
Frank H. Payne, Jr.
1
Paul R. Foote
19
Connie Foote, his wife
1
Total shares
65
Standard's officers were: Paul R. Foote, President, Treasurer, and Chief Executive Officer. Frank H. Payne, Jr., Vice President and Secretary. Frank H. Payne, Sr., the principal stockholder, has been with Standard and its predecessor over forty years. He devoted the majority of his efforts to selling the products of Standard in Cincinnati, Ohio, and vicinity. Paul R. Foote was formerly employed as a certified public accountant and entered into the employment of Standard in May of 1938. He became president and treasurer of Standard in December of 1941. In 1941 and 1942 *107 approximately 10 per cent of Standard's total business consisted of the sales of chocolate, including chocolate syrup, cold fudge, and hot fudge. On April 30 of 1942 the Office of Price Administration set the maximum price on Standard's products retroactive to the highest published price in March of 1942. Standard had doubled its prices on chocolate products in February of 1942 in anticipation of war shortages in tin, cocoa, and sugar, all of which had to be imported to the United States. Standard's maximum prices were fixed at approximately double that of its chief competitors, such as Hershey, Johnson, and Nestle's. Fruit prices had not been increased by Standard as drastically as chocolate since they were domestic items. In May of 1942, sugar and cocoa rationing took effect to the extent that Standard's sugar for industrial use in connection with its manufacture of chocolate products was limited to between 70 and 80 per cent of the amount of sugar used in prior years. As a provisional user and processor of fruit products, Standard was permitted approximately 90 per cent of the sugar used in prior years. The processors of cocoa beans were rationed by O.P.A., and in turn rationed *108 their customers, including Standard, to the extent of sixty, seventy, and eighty per cent of the 1941 use of cocoa. Throughout the years in question, Standard continued to operate as before to the full extent of the rationing and O.P.A. limitations. Standard's chocolate products were in turn rationed to its own customers who had made purchases in 1941. Under pressure of customer demand for more chocolate, and in order to keep the plant in full production during times when it was unable, by reason of shortages, to manufacture its regular product, Standard undertook the production of a chocolate product out of substitutes for pure cane or beet sugar, such as molasses, malt syrup, honey and whatever else could be found. Cocoa was purchased wherever found and in any form. This substitute was inferior to the regular "Sugarnut" product, and varied in consistency and taste. It was given the name "Nothing But." The production of "Nothing But" was undertaken over the better judgment of Standard's President, Paul R. Foote. Standard's chief competitors had endeavored no production of substitutes, and Standard was known for its quality merchandise. "Nothing But" was sold by Standard under *109 its usual open account policy of thirty days net with one per cent discount for payment in ten days. There was no guarantee of "Nothing But" quality. Standard also undertook the sale of other substitute emergency products such as "Fountainola," purchased from another manufacturer as a substitute for fountain cola, and malt syrup purchased from breweries. The demand was so great for any chocolate that Standard could sell all it made, even the chocolate made as a substitute for its regular product, but this prodict was sometimes so bad that Standard was often forced to make adjustments with its customers. Many complaints were received from customers and salesmen. The consensus of opinion of Standard's independent salesmen [1] was that Standard was destroying its good will and reputation in the trade. In March of 1943, Paul R. Foote, Standard's President, instructed its salesmen to take no more orders for "Nothing But" chocolate syrup. Sale and production was stopped thereafter of other substitutes. *110 Frank H. Payne, Sr., most of whose efforts were devoted to selling, maintained that Standard should deal in substitutes in order to keep its customers in business and to meet the market created for emergency products. At a meeting attended by Payne, Foote, and their wives, the opposing views of the two principal stockholders of Standard were reconciled in May of 1943 by the suggestion made by one of the wives that a new company should be formed to deal exclusively in substitutes or emergency products. In June of 1943 a partnership was formed between the members of the Foote and Payne families, all of whom were stockholders in Standard, "to buy, sell, trade and exchange food products or substitutes to retail and wholesale trade * * *." The new company was entitled "Riverview Sales Company," and a certificate of partnership giving the names of the partners was duly filed with the county clerk. A bank account was opened in the name of the partnership and $5,000 was deposited by the partners from their own funds. Subsequently, another $5,000 was deposited by the partners from their individual funds. The partnership was listed in Dun and Bradstreet and in the city directory. The partnership, *111 hereinafter referred to as Riverview, could secure no telephone due to the wartime shortages. A set of books was opened in the name of Riverview. These books were kept separately from those of Standard, and they accurately reflected all transactions entered into by the partnership. The partnership purchased a warehouse building for $7,000 adjacent to Standard where the partnership intended to keep its offices. Riverview's name was placed above the doorway. The facilities proved unsuitable for office purposes, and could not be improved due to the war shortages. Riverview maintained its offices in a separate, partitioned and labeled space in Standard's offices. No rent was paid, but Standard owned extra space and had on a prior occasion leased a similar partitioned area rent free to another agency unconnected with the parties in question. In 1945 Riverview secured office facilities elsewhere. The warehouse was rented to Standard at a reasonable rental of $200 a month. Taxes and insurance on the property were paid by Riverview. The partnership employed Jerome Geis as a bookkeeper and manager. This employee performed no services for and was not paid by Standard with the exception of *112 a period of thirty to sixty days in 1944 after Standard's regular bookkeeper left its employment and before a new bookkeeper could be employed. Riverview, under its own employer's identification number, withheld taxes and social security from Geis' salary of $50 a week. Riverview made its first sale of substitute products in July of 1943. Sales were made by the same class of independent salesmen and sales representatives in the retail and wholesale fountain and ice cream trade as used by Standard. In August of 1943 Riverview entered into an oral agreement with Standard whereby the latter agreed to manufacture chocolate syrup, cold and hot fudge, and other chocolate substitutes when and if it finished production of its own regular "Sugarnut." In return, Riverview agreed to buy this substitute product without recourse at estimated cost plus ten per cent. In entering into this agreement, the parties considered various factors. The manufacturing of "substitute" chocolate products was a minor item in the schedule of Standard. Before rationing, all of Standard's chocolate products amounted to approximately ten per cent of its total production. In addition, there would only be production *113 of substitute chocolate until such time as shortages would cease to exist and Standard could resume unlimited production of "Sugarnut." Standard had previously undertaken contract production at an estimated cost plus ten per cent for and on behalf of an unrelated company, and the parties knew that the Government was letting war contracts at cost, plus ten per cent. Standard's name did not appear on the "substitute" chocolate. In determining the actual sales price between Standard and Riverview,foote estimated the cost of the product, added three per cent to cover possible error, and added ten per cent. Later, representative batches were examined by an accountant, who determined that Standard had actually received a profit of fifteen to twenty per cent for the years 1943 and 1944 from Riverview. This product was marketed under Riverview's brand name of "Queen City Products." Riverview secured an O.P.A. price ceiling equivalent to the price limitation on "Sugarnut," although the price set by Riverview was somewhat below this level. Terms of sale for "Queen City Products" were cash in advance, sight unseen, with no guarantee or warranty as to quality, delivery, or otherwise. Standard *114 was sometimes six to eight months in arrears in filling the orders of Riverview. Cash received from the Riverview sales was received by Geis. Some was deposited and some was advanced to Standard against purchases. These balances were usually settled by the end of each month. Products were shipped by Standard according to orders turned over by Geis, and under the name of Riverview printed on labels furnished by Geis. Complaints and correspondence, as well as orders, were handled by Geis on Riverview stationery or over Standard's telephone, although on at least one occasion the partners took care of a complaint. Standard took no orders for Riverview's products from any customer, nor dealt with any complaints, nor was the reverse true. The sales' representatives of both Standard and Riverview, with the exception of Payne, were independent salesmen who handled products of several companies and manufacturers. Some representatives had their own sales forces. The brokerage commissions were a percentage of sales made. On four occasions, the partnership purchased fruits which were later sold to Standard. On one occasion, Foote, acting as a partner, purchased "distressed" apricots which *115 were improperly iced in transit. The purchase was made at salvage price and sold to Standard at approximately the general market value. On the second occasion, the partnership purchased peach puree for $7,420 and resold it to petitioner the same month for $10,920. On a third occasion, frozen pears were purchased by the partnership for $7,308.60 and resold to Standard the same month for $10,681.80. In January of 1944, Riverview purchased $15,338.70 worth of nectarines. Nectarines costing $6,996.60 were sold to Standard in 1944 for $7,696.28, and the remaining quantity was sold to Standard in 1945. In this case, the sales price was purchase price plus ten per cent. Riverview sustained an actual loss on this transaction since warehousing and other expenses were not taken into consideration. All four transactions were entered into by Riverview because Standard might have been able to use the product. In each situation, the product had never been used before by Standard, and constituted what it deemed a "substitute." After such a product was found to be usable, Standard thereafter purchased the product directly on its own behalf. No other fruit purchases were made. Riverview, as a "war *116 baby," had served its purpose and ceased to do business by the end of 1947. During its existence, the partnership entered over 4,000 actual sales. Over 400 deposits were recorded in its bank account, and over 1,300 checks were recorded. A summary of business operations of Standard and Riverview is set out in the following tables: Riverview
1943
1944
Purchases
From Standard
$ 25,208.97 (51.43%)
$ 65,533.86 (79.17%)
Fruit Purchases
21,152.50
15,338.70
Other
2,658.91
1,904.06
Total Purchases
$ 49,020.44
$ 82,776.62
Net Sales
$ 93,203.22
$134,313.22
Brokerage
6,017.87
23,938.22
Net Income
38,864.01
46,252.29
Standard
Purchases
$503,099.93
$483,943.74
From Riverview
31,451.78 (6.25%)
7,696.28 (1.59%)
Net Sales
$725,954.65
$721,588.48
Brokerage
71,157.30
55,965.59
Net Income
58,793.88
9,720.44
Percentage of Gross Sales of Chocolate by Standard
1942
1943
1944
Gross Sales
$422,628.22
$777,500.75
$772,120.36
Regular Chocolate
6.98%
5.12%
2.19%
Nothing But
4.96%
4.89%
Substitute Chocolate sold
to Riverview
2.75%
8.25%
Total Chocolate
Gross Sales
11.94%
12.76%
10.43%
The *117 decrease in income of Standard in 1944 is attributable to the fact that O.P.A. price ceilings on fruit products remained fixed, whereas costs of the raw produce continued to rise. In 1943, petitioner, Standard, employed accountants to prepare its 1943 tax returns. Standard was granted one extension of time for filing these returns until May 15, 1944. The returns were unprepared and not filed until sixteen days thereafter. For 1944, Standard prepared and filed a timely tentative excess profits tax return based on approximately one-half of its 1943 business and paid one-quarter of the amount due. An extension was granted to May 15, 1945. At that time, it was found from petitioner's records that there were no excess profits taxes, so a final excess profits tax return was not filed. Petitioner's failure to file timely returns in 1943 was not due to reasonable cause, whereas its failure to file an excess profits tax return for 1944 was due to reasonable cause and not willful neglect. Standard's factory and offices are located in the "bottoms" of Cincinnati, Ohio. The building is old and has been flooded seven or eight times, and on several occasions for weeks at a time. The fourth *118 floor of the building was gutted and sagging. In 1943, petitioner expended $312.81 for lumber and $200 for labor in laying new flooring on top of the old floor. Also, in 1943, the city elevator inspector compelled petitioner to deepen its elevator pit. This necessitated the rerouting of a water line and the installation of a new cesspool at the bottom of the pit, together with replacing the concrete broken by the deepening of the pit. The total cost of this work was $576.57. In 1944, the wood joists supporting petitioner's first floor began to sag. The Government granted a priority to obtain steel beams as a maintenance repair. The steel beams were shored up under the wooden joists. The cost was $506. Also, in 1944, the Cincinnati Board of Health determined that petitioner's boiler room was not airtight, and that dust and fumes were entering the cooking room. In order to correct this situation, petitioner expended $200 for plastering the walls and ceiling of the boiler room with gypsum plaster over metal laths. Also, in 1944, petitioner's brick flooring in the basement became unserviceable and five inches of concrete were laid over the flooring at a cost of $539.60. Brick could *119 not be procured due to the war. The concrete in petitioner's cooking-room on the first floor requires replacement every three years due to the effect of the acids and syrups used in petitioner's manufacturing, and sometimes requires patching within six months. The replacements in 1944 amounted to $694.15. At this time it was thought best to replace old sewers and reconnect the lines. The expenditures for this purpose were $1,003.84 and $359.87. Petitioner's plant had both alternating and direct current. Direct current motors were burned out by indirect current outlets, so petitioner's oven-maintenance man undertook to change and correct defective wiring. Petitioner's underwriters insisted on other changes throughout the building. The maintenance man was drafted and petitioner expended $1,061.19 in finishing the separate jobs. Also, in 1944, petitioner installed a new boiler which was capitalized. Incident thereto, petitioner expended $299.98 and $336.92 for installation of hot water lines, thermostatic valves, as well as piping and water heaters. Also, in 1944, petitioner expended $459.00 in insulating and painting steam pipes in the factory.
Other items of claimed expenditures *120 could not be identified at time of trial. During 1943 and 1944, and for many years prior thereto, Standard claimed and was allowed depreciation on its building, machinery and equipment, and furniture and fixtures. Opinion KERN, Judge: The first issue in this proceeding is whether the Commissioner erred (a) in including in petitioner corporation's income for the taxable years 1943 and 1944 the income of Riverview Sales Company, a partnership composed of the stockholders of petitioner corporation, in accordance with the provisions of section 22 (a) of the Internal Revenue Code; [1] or (b) in allocating the net income of Riverview Sales Company for the taxable years 1943 and 1944 to petitioner in accordance with the provisions of section 45 of the Internal Revenue Code. [2]
*121 The principal argument of respondent is that the partnership had no business purpose independent from that of petitioner corporation, and that the controlling interests of the corporation shifted a part of the profits which would otherwise have been earned by the corporation to the partnership controlled by the same interests. The petitioner on the other hand contends that the partnership was formed for sound business reasons, that it was a real, separate, and active business entity, that its affairs were not commingled with those of the petitioner, that the bookeeping was separate and properly reflected the income of each, and that respondent's determination was the equivalent of a consolidation of the incomes of petitioner and the partnership. Petitioner relies principally on the decisions in Seminole Flavor Company, 4 T.C. 1215; Miles-Conley Co., Inc., 10 T.C. 754, affd. (on another issue) April 4, 1949, (CCA-4) 173 Fed. (2d) 958; and Buffalo Meter Company, 10 T.C. 83. Reduced to its essence, the problem that confronts us is to determine, under the facts of this proceeding, whether this case falls within the scope of the *122 doctrine of Forcum-James Co., 7 T.C. 1195, and R.O.H. Hill, Inc., 9 T.C. 153, cited by respondent, or whether it is controlled by the authorities strenuously urged upon us by petitioner. The inapplicability of the Forcum-James and Hill cases is manifest, for in those cases, unlike here, partnerships, whose income respondent sought to tax to others, did nothing whatsoever to earn the impugned income, the claim there being made by the taxpayers that the corporations were acting as agents for the partnerships. Here, it is quite clear that not only in the establishment of Riverview, but also in its operations, there was substantial business motivation and business substance, and the partnership actually engaged in those activities which produced the income that respondent seeks to tax to petitioner. The underlying thesis of respondent's argument that petitioner could as well have done all the things that the partnership did, and thereby could have earned the income that the partnership did, was advanced by him in the Seminole Flavor and Miles-Conley cases, and in each instance it was rejected by us. We find no merit in it. What we said in Buffalo Meter Co., supra, at pages 88 and 89, *123 is appropriate here: "The petitioner's stockholders here were under no obligation to continue the business, either the whole or any part of it, in corporate form. They might have dissolved the corporation entirely and transferred all of its functions to the partnership. As has been said repeatedly, the tax laws do not undertake to deny taxpayers the right of free choice in the selection of the form in which they carry on business. * * *" Whatever might be the result in a case where "an unnatural division" of the corporate business between the corporation and a partnership composed of its stockholders is attempted, such is not the situation that this case presents. On the first issue, we decide in favor of petitioner. The second issue is whether respondent erred in disallowing certain deductions for the taxable years 1943 and 1944 in accordance with the provisions of section 24 (a) (2) and (3) of the Internal Revenue Code, [3] the petitioner claiming that these were proper deductions under section 23 of the Code as ordinary and necessary business expenses for the upkeep and maintenance of its premises and equipment. *124 The text to be applied is well stated in Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106: "* * * In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *" A review of the outstanding authorities does not assist materially in resolving the question presented. *125 It is always a difficult factual question based upon the facts and circumstances in each individual case. 4 Mertens Law of Federal Income Taxation, 373. From the record before us, we observe that some of the expenditures were made merely to mend the property in order to keep it in an ordinarily usable condition, while others undoubtedly added to the value of the property by arresting deterioration and prolonging its useful life. In this determination, we have considered not only the purpose of the expenditure, but the nature and effect of the work performed. American-Bemberg Corp., 10 T.C. 361. A scrutiny of the facts presented to us with reference to each of the questioned items leads us to conclude that the expenditures for the plastering of the boiler room, for the shoring up of the first floor, and for the repairing in a makeshift manner of the floor in the basement, as well as the concrete patchwork on the floor in the cooking room are deductible. The remainder of the items, upon which proof has been offered, appear to us to be properly characterized as capital expenditures, and hence non-deductible. The final issue is whether petitioner's failure to file its *126 returns for the year 1943, within the time prescribed by law, and its failure to file any excess profits tax return for the year 1944 were due to reasonable cause and not attributable to willful neglect within the meaning of section 291 (a) of the Internal Revenue Code. Petitioner attributes its filing of the 1943 returns sixteen days after the due date to the failure of its accountants to procure or to notify petitioner in time to procure an additional extension of time for filing. Even if petitioner had proved fault in the accountants, it would be responsible for the actions of its employees or agents. Pioneer Automobile Service Co., 36 B.T.A. 213; Eagle Piece Dye Works, 10 B.T.A. 1360. Petitioner has not shown reasonable cause. C. C. Humphries, et al., 17 B.T.A. 811. In 1944, petitioner filed a tentative excess profits tax return and paid tentative excess profits tax. Upon the final computation of its income as a preliminary to the filing of returns, it found and reported excess profits net income of $9,750.44, and, therefore, filed no return pursuant to the provisions of section 729 (b) (2) of the Internal Revenue Code *127 . Respondent's arguments in support of the penalty are that if the net income could be increased to $10,000, petitioner would have had to file a return. As is apparent from our decision on the first two issues, petitioner's opinion, as determined by its president, an accountant of long standing, was a sound and reasonable interpretation of the tax consequences of the factual situation in which it found itself. The failure to file a return was due to reasonable cause. Economy Savings & Loan Co. v. Commissioner, 158 Fed. (2d) 472. Decision will be entered under Rule 50. Footnotes
1. These were salesmen or jobbers who sold on commission the product of Standard and other manufacturers. They were not employees of Standard and did not sell Standard's products exclusively.↩
1. 22(a) General Definition. - " Gross income" includes gains, profits, and income derived from * * * trades, business, * * * or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; * * * or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * * ↩
2. Section 45. Allocation of Income and Deductions. In any case of two or more organizations, trades or business (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or business.↩
3. Section 24. ITEMS NOT DEDUCTIBLE. (a) General Rule. - In computing net income, no deduction shall in any case be allowed in respect of - * * *
(2) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate; (3) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made; * * *↩