John E. Walsh, Jr., and Anna D. Walsh v. Commissioner.
Walsh v. Commissioner
Docket Nos. 85544, 86978.
United States Tax Court
T.C. Memo 1961-278; 1961 Tax Ct. Memo LEXIS 71; 20 T.C.M. (CCH) 1468; T.C.M. (RIA) 61278; October 5, 1961
*71 1. Held, certain advances totaling $24,082.18 made by petitioner John E. Walsh, Jr., during 1953, 1954, and 1955 to EE, a corporation wholly owned by petitioners' son David, constituted a true indebtedness between the parties rather than gifts. Held, further, the debts became worthless in 1956 and were non-business rather than business debts. 2. Held, certain expenditures totaling $5,141.85 made by petitioner during 1956 in improving and restoring certain farm property purchased in 1954 were capital expenditures as determined by the respondent who, as a part of the determination, allowed petitioner a deduction for depreciation of such improvements in the amount of $42.85. 3. Held, an amount of $7,500 paid by petitioner in 1957 to EE as a paper consultant fee constituted an ordinary and necessary expense paid during the taxable year for the production of income and is deductible under section 212 (1) of the Internal Revenue Code of 1954. 4. Held, any claim petitioner had against EE regarding payments made by him in 1957 to two banks by reason of EE's inability to pay on certain notes that had been executed by EE and endorsed by petitioner as guarantor was worthless at the time the *72 payments were made and is deductible in 1957 to the extent of $915.44 as bad debts under section 166, I.R.C. 1954. Patrick J. Head, Esq., 201 World Center Bldg., Washington 25, D.C., for the petitioners. Charles P. Dugan, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax for the calendar years 1956 (Docket No. 86978) and 1957 (Docket No. 85544) in the amounts of $21,594.79 and $4,871.30, respectively. The cases were consolidated for hearing and disposition. The issues are whether the respondent erred in disallowing deductions claimed by petitioners as follows: (1) $24,082.18 claimed in 1956 as a business bad debt; (2) $5,099 claimed in 1956 as repairs on farm buildings; (3) $7,500 paid to Engineering Enterprises, Inc., in 1957 as a consultant fee and claimed in 1957 as an expense for the production of income; and (4) $915.44 claimed in 1957 as a bad debt. Findings of Fact Some of the facts were stipulated and they are incorporated herein. Petitioners are husband and wife and, during the years 1956 and 1957, were residents of the District of Columbia. They filed joint Federal income tax returns *73 for those years with the district director of internal revenue at Baltimore, Maryland. Petitioner John E. Walsh, Jr., will sometimes be referred to herein as petitioner. During the years 1956, 1957, and thereafter, petitioner was employed by Walker-Goulard-Plehn Company, Inc., a New York corporation engaged in the paper merchandising business. This corporation will sometimes be referred to herein as WGP. Petitioner was vice president of WGP from February 16, 1953, to June 24, 1958, when he became president and chairman of the board. Since 1949 he has owned 1/8th of the stock of WGP (311 shares). He receives no salary and his compensation is strictly on commissions. During the years 1952 through 1957, petitioner's gross income from WGP, exclusive of dividends, was in amounts as follows: 1952
$ 99,799.84
1953
46,676.10
1954
51,223.22
1955
80,271.61
1956
107,599.59
1957
57,473.34
Petitioner was born in 1895. He graduated from a commercial high school in 1913 and has received no further formal education. In November 1952, Engineering Enterprises, Inc., hereinafter sometimes referred to as EE, was incorporated under the laws of the State of Virginia. In June 1958, the charter of EE was voided for failure *74 to pay franchise taxes. All of the stock of EE was owned by David Arthur Walsh, a son of petitioners, and sometimes referred to herein as David. At the time David organized EE, he had a bachelor's degree in electrical engineering and had done graduate work in physics. He is a registered professional engineer, No. 2627, in the District of Columbia. For approximately 10 years prior to 1958 he had been a member of the technical association of the pulp and paper industry. During 1953, 1954, and 1955 petitioner made advances to EE in the amounts of $8,213.90, $5,100.41, and $11,767.87, respectively. Promissory notes due on one year after date for these advances and in the above amounts were executed by David as president of EE on January 5, 1954, December 29, 1954, and December 28, 1955, respectively. The notes were made payable to the order of petitioner, bore no interest, and were not secured. At the end of each of the years 1953, 1954, and 1955, petitioner made an informal demand on David as president of EE for a return of the advances petitioner had made to EE but each time David persuaded his father to wait a while longer with the hope that certain contracts EE had would turn out to *75 be profitable. In November 1955, EE was awarded a contract by the United States Weather Bureau, Department of Commerce (Contract No. Cwb-8675) for the production of 100 retransmitters and recorders for a total contract price in excess of $160,000. On October 26, 1955, petitioner and Morris Housen, president of Erving Paper Company, each executed an indemnity agreement with Liberty Mutual in consideration of that company's procuring a bond on behalf of EE, as principal, in favor of the United States as obligee, each in the amount of $40,900.75. It was because of the above contract No. Cwb-8675 that petitioner had agreed not to make a formal demand for the repayment of the advances made in 1953, 1954, and 1955 in the total amount of $25,082.18 and, as a result of the contract, petitioner made additional advances to EE during 1956 of $19,022.64. EE experienced difficulties during 1956 in regard to the performance of the Weather Bureau contract. On June 8, 1956, the Weather Bureau addressed a letter to EE, for the attention of David, enclosing a copy of a laboratory report made regarding Contract No. Cwb-8675 and stated, in part, that "the report indicates that the recorder fails to meet *76 the requirements of the specifications in many important details" and that "Under the circumstances, therefore, it appears that the contract covering the recorders should be cancelled" but that "Action will be delayed, however, pending early reply from you." On August 30, 1956, the Weather Bureau wrote David and EE by registered mail in reference to Contract No. Cwb-8675, the last paragraph of which is as follows: In view of the long delay with no deliveries effected on this order or satisfactory samples being submitted, unless positive production in accordance with Weather Bureau specifications and requirements is evidenced by your company within thirty days it will be necessary for this office to cancel the contract and purchase the equipment elsewhere. By December 1956 none of the instruments under Contract No. Cwb-8675 with the Weather Bureau had been delivered. No amount had been paid by the Weather Bureau to EE by December 1956. In view of the difficulties David and EE were having with the Weather Bureau, petitioner became quite concerned regarding the advances he had made to EE during 1953, 1954, and 1955. On December 13, 1956, petitioner wrote David an 8-page letter stating *77 in part that he was concerned with the moneys "you owe me for 1953, 1954 and 1955" and that he would like David's response as soon as possible. In this letter, petitioner also stated in part: Giving effect to this total sum of $25,082.18, for 1953, 1954, and 1955 (and, too, sensing the pix for 1956, gt of $19,022.64 for 1956) I am, frankly, at the end of my rope in affording any further financial assistance to you. More to point, I would appreciate some resolution of '53-'54-'55 - As to '56, as aforesaid, I fully believe that 'before end of 1957, you'll be able to refund me, en toto, the $19,022.64 out of the WB contract operations. On December 21, 1956, David, as president of EE, answered petitioner's letter to him of December 13, 1956, and offered to petitioner "A composition of debts for the years 1953, 1954 and 1955 in a note of Engineering Enterprises Inc., (personally endorsed by me) in the amount $1,000.00 (demand tenure), as full payment for all money loaned as of this date, for the above period." Petitioner accepted this offer. As a result of David's letter of December 21, 1956, petitioner thereafter, in 1956, determined that $24,082.18 of the advances made by him to EE *78 during 1953, 1954, and 1955 were worthless and deducted the amount on the joint return for 1956 as "Loss from Business Bad Debt." The respondent disallowed the deduction and, in a statement attached to the deficiency notice, explained his disallowance thus: It is held that you have failed to establish that the amount of $24,082.18 allegedly due from Engineering Enterprises, Inc. constitutes a proper bad debt deduction for the taxable year 1956 under the provisions of section 166 of the Internal Revenue Code of 1954. Notwithstanding the Weather Bureau's threat in 1956 to cancel Contract No. Cwb-8675, it continued to negotiate with David and EE and the latter's successor, Engenco, Inc., a corporation also wholly owned by David which David at some undisclosed date had organized to take over and carry on the business of EE. Loans were made to EE by persons other than petitioner, including Harry McDonald, Housen, and Stephen Balogh. Credit was extended to EE by WGP, Housen, Gubleman Printing Co., Arnold Engineering Co., and by Chase Manhattan Bank through petitioner as guarantor. Petitioner, in an attempt to save his credit standing in the paper industry, to prevent loss on the performance *79 bond for which he and Housen were indemnitors, and to attempt the recoupment on notes held by him from EE by completion of Contract No. Cwb-8675, made additional loans from his own funds and from extensions of credit of other parties to EE in this regard for the years 1957, 1958, 1959, and 1960 in the amounts of $32,163.77, $14,527.92, $20,386.08 and $35,841.61, respectively. All of EE's taxable years were loss years. During the years 1957 to 1960, inclusive, payments were made by the Weather Bureau to EE under Contract No. Cwb-8675 as follows: 1957
$ 24,878.03
1958
41,839.48
1959
1,295.80
1960
77,456.78
Total
$145,470.09 The above amounts paid by the Weather Bureau to EE were used to pay current operating obligations under Contract No. Cwb-8675. The 1953-1955 advances by petitioner to EE created a real indebtedness and were not gifts. The debts to the extent of $24,082.18 became worthless in 1956. The debts were nonbusiness rather than business debts. Repairs on Farm Buildings On September 29, 1954, petitioner Anna D. Walsh purchased a farm in Barton, Vermont, from Emile and Pauline LeMay, consisting of 280 acres. The purchase price of $5,000 was paid by petitioner John E. Walsh, Jr. Until *80 purchased in September 1954, the LeMays had occupied and operated the farm as a hay and dairy farm. Timber on the property was also sold. Petitioners have occupied the farm off and on since its purchase. Each year petitioners have sold the hay crop from the farm. In the latter part of 1956, petitioner expended $5,141.85 in improving and restoring the farm property. These improvements consisted mainly of the construction of a new building, the installation of new roofs on all buildings, and the construction of a fieldstone open fireplace. Practically nothing was done to the property from the time of purchase until 1956. On their joint return for 1956 petitioners claimed a deduction in the amount of $5,141.85, which deduction was designated as "Repairs on Farm Bldgs." Respondent disallowed the deduction of $5,141.85 but treated the expenditure as a capital item and allowed petitioners a deduction for depreciation of $42.85. In a statement attached to the deficiency notice, the respondent explained this adjustment thus: (b) It is held that the amount appearing on the return for the "repair" of a barn on your farm constitutes a capital expenditure and the amount is disallowed as an expense. *81 The improvement is to be depreciated over a useful life of 20 years. Computation of Adjustment: Cost of repairing barn disallowed
as an expense
$5,141.85
Depreciation allowable thereon be-
ginning November 1, 1956
42.85
Increase in income
$5,099.00
The expenditures of $5,141.85 made by petitioner in 1956 were capital expenditures. 1957 Paper Consultant Expenses Petitioner did not retain a paper consultant prior to 1952. In 1952 David left the employ of the Bureau of Standards and organized EE. Petitioner paid EE between $3,500 and $5,000 in 1952 for services rendered to petitioner. He paid the same or larger amounts in 1953 and 1954. In 1955 he paid the corporation $5,200. In 1956 and 1957 petitioner paid EE in each year as a retainer the sum of $7,500 for the services EE, through David, rendered to petitioner. Petitioner claimed deductions for the amounts paid in 1955, 1956, and 1957. Respondent disallowed the deduction for 1957 but did not disallow the similar deductions claimed on the 1955 and 1956 returns. In a statement attached to the deficiency notice, the respondent explained his disallowance thus: (a) The deduction claimed for professional consultant - paper in the amount of $7,500.00 *82 as part of business expenses claimed on page 2 of your return is disallowed for the reason that the claimed deduction was neither an ordinary and necessary expense paid or incurred during the taxable year in carrying on your trade or business, nor an ordinary and necessary expense paid or incurred during the taxable year for the production of your income. The services performed by EE through its president (David) were of a highly technical nature which petitioner considered were necessary to assist him in earning the large commissions he was receiving. For instance, in 1957, petitioner was faced with the rejection of 150,000 pounds of paper he had sold to the Government Printing Office. He called on EE to look into the matter. EE, through David, made certain recommendations that served to correct the difficulty. The order for the paper was not rejected and petitioner received his commission. Another incident in 1957 concerned $75,000 worth of paper from Holyoke, Massachusetts, sold to the Coast & Geodetic Survey. The latter complained that the paper was too dry and that they could not use it. Petitioner had the choice of sending the paper back to the mill or to call on the technical *83 knowledge of EE through David for a solution of the problem. By a certain process used by EE, the paper was reconditioned and returned to the Coast & Geodetic Survey to their complete satisfaction; whereupon petitioner received his commission. Also, in 1957 petitioner believed that certain mills were not making the paper right and he therefore used the technical assistance of EE to see that they did make it right. Petitioner did not possess the technical knowledge himself and he needed someone to assist him. David had the technical knowledge that his father lacked. There were at least 12 separate, similar occasions in 1957 where EE, through David, was called upon to do some work of a technical nature to assist petitioner in earning his commissions on the paper sold for WGP. The latter did not employ a paper consultant. Petitioner is a commission merchant in the field of paper whose main income is derived from brokerage commissions on sales for his principal WGP. Petitioner's employment of a technical paper consultant in 1957 was an ordinary and necessary expense paid by the petitioner for the production of petitioner's income. 1957 Bad Debt Loss During 1957 petitioner made payments *84 totaling $321.64 to the Riggs National Bank, Washington, D.C., and $696.72 to the National Bank of Washington. He made these payments because demand was made upon him as the endorser in each case by the respective banks on account of EE's inability to pay when called upon. In each case suit was brought against petitioner to obtain payment. On the joint return for 1957 petitioner deducted as "Bad debt loss" an amount of $915.44, made up of the $696.72 paid to the National Bank of Washington and, for some unexplained reason, only $218.72 of the $321.64 paid to the Riggs National Bank. The respondent disallowed the deduction and, in a statement attached to the deficiency notice, explained his disallowance thus: (b) The deduction claimed on page 2 of your return for a bad debt loss in the amount of $915.44 is disallowed for the reason that you have failed to establish that the debt became worthless within the taxable year. Any claim petitioner as guarantor had against EE regarding the above payments made to the two banks during 1957 was worthless at the time the payments were made. Opinion It is the respondent's position that the advances made by petitioner to EE during 1953, 1954, and *85 1955 were, in substance, gifts to his son rather than the creation of a debtor-creditor relationship between petitioner and EE. The fact that David owned all of the stock of EE warrants a close scrutiny of the transaction to see if, in substance, the advances were gifts. The evidence, however, establishes that the advances were debts and not gifts. Petitioner at all times demanded and expected the repayment of every cent that he advanced, and formal promissory notes were executed for the amounts so loaned. We hold that the advances created a bona fide indebtedness and should not be considered as gifts. Respondent further contends that if we find the advances to be debts, which we do, then we should find that the debts did not become worthless in 1956. We are unable to make such a finding. We think petitioner has fully established that the advances made in 1953, 1954, and 1955, to the extent of $24,082.18, became worthless in 1956. In November 1955, EE was awarded what appeared to be a very profitable contract with the Weather Bureau but during 1956 EE ran into difficulty and by the end of 1956 things looked hopeless. David testified that as a practical matter he and EE were bankrupt. *86 The Weather Bureau had made several threats to cancel its contract. It was then that petitioner made formal demand for the repayment of his advances made in 1953, 1954, and 1955. All that EE could do was to give him a note for $1,000, personally endorsed by David, as a composition of debts totaling $25,082.18, which was accepted by petitioner. We hold that the debts, to the extent of $24,082.18, became worthless in 1956. There remains for determination the question whether the debts were business or nonbusiness. If business debts, section 166(a)(1) [1] of the Internal Revenue Code of 1954 applies. If nonbusiness debts, subsection (d) [2] *87 of section 166 applies. See also section 1.166-5 of the tax Regulations under the 1954 Code. [3] *88 The debts were not "created or acquired (as the case may be) in connection with" or "incurred in the taxpayer's trade or business" as those terms are used in section 166(d)(2). Petitioner was not in the business of lending money. His "trade or business" was that of a commission merchant in the field of paper and an employee and officer of WGP. The loans here in question had no proximate relation to petitioner's trade or business. We hold that the debts in question, totaling $24,082.18, were nonbusiness debts. Dominick J. Salomone, 27 T.C. 663. Petitioner contends in the alternative that the $24,082.18 is deductible under section 165(c)(2), I.R.C. 1954, as "losses incurred in any transaction entered into for profit, though not connected with a trade or business." *89 There is no merit in this alternative contention. It is settled beyond doubt that the bad debt provisions and the loss provisions are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934); Dominick J. Salomone, supra. As to the second issue regarding the expenditures made in improving farm property, we sustain the respondent's determination on the basis of our findings. The evidence shows that among the improvements were the construction of a new building, the installation of new roofs on all buildings, and the construction of a fieldstone open fireplace. Expenditures for such improvements are capital expenditures. Illinois Merchants Trust Co., Executor, 4 B.T.A. 103; Bloomfield Steamship Co., 33 T.C. 75. The third issue is whether petitioner is entitled to deduct the retainer fee of $7,500 paid to EE in 1957 for professional services rendered to petitioner by EE's president who was an electrical engineer. Similar fees were deducted by petitioner and allowed by the respondent for the years 1955 and 1956, but, for the year 1957, the respondent disallowed the deduction. The explanation given by the respondent in the statement attached to the deficiency *90 notice for the disallowance was "that the claimed deduction was neither an ordinary and necessary expense paid or incurred during the taxable year in carrying on your trade or business [section 162(a), I.R.C. 1954], [4] nor an ordinary and necessary expense paid or incurred during the taxable year for the production of your income [section 212(1), I.R.C. 1954]." [5] Since, in our opinion, the $7,500 is clearly deductible under section 212(1), we will pass section 162(a). Petitioner's principal income was derived from commissions for selling paper. He deemed it necessary to retain the services of a professional paper consultant to advise him and assist him with highly technical matters which frequently arose in connection with *91 the sales of paper. Asked on direct examination what effect the retention of such services would have on petitioner's income, he answered: If I were successful, either by myself, or by the utility of somebody else's superior technical ability, I would get more business and would make more money. During the year 1957 petitioner called upon his consultant for technical advice on at least 12 occasions. We are at a loss to know why a reasonable fee of $7,500 paid for such advice is not an ordinary and necessary expense of producing income. We have held in several cases that payments for advice given a taxpayer in connection with the production of the taxpayer's income are deductible by the taxpayer. Edward Mallinckrodt, Jr., 2 T.C. 1128, 1148, affirmed on other issues, 146 F. 2d 1 (C.A. 8, 1945); Elma M. Williams, 3 T.C. 200; Nancy Reynolds Bagley, 8 T.C. 130. Respondent in his brief argues that the fee in question was attributable to WGP's business and therefore not deductible by its officer, citing Bert B. Rand, 35 T.C. 956, and H. William Ihrig, 26 T.C. 73. These cases are not in point. In the Rand case, we said: In the instant case, the expenditure of the $8,890.50 by petitioner *92 was not an expense incurred by him in carrying on his own trade or business or incurred in the production or collection of his own income * * * but was compensation paid to a corporate officer for services which the latter rendered to the corporation. The taxpayer in the Ihrig case was an officer-stockholder of two corporations. The corporations lacked cash to meet current expenses, whereupon the taxpayer paid certain corporate expenses to keep the corporations alive. We held the expenses not deductible by the taxpayer. In the instant case, petitioner paid EE the $7,500 for services rendered to him in the production of his own income and not for services rendered to WGP. We hold, on the basis of the authorities previously cited, that the respondent erred in disallowing the deduction. On the last issue, the respondent argues that the guaranty payments are not deductible in 1957 "because it has not been shown that the debt became worthless during 1957." The very reason petitioner was called upon to make these payments was that EE could not make them. Of course, when petitioner made the payments he then had a claim against EE for what he had paid. But it was just as impossible for EE *93 to pay petitioner as it was for EE to pay the banks. The claims petitioner had against EE were worthless the moment they arose. Our only difficulty as to this issue is in the amount. The parties have stipulated that petitioner paid the banks $696.72 and $321.64, or a total of $1,018.36. Yet petitioner deducted only $915.44. Counsel for respondent at the hearing called this to the attention of petitioners' counsel, and the latter said that the $915.44 "is the correct claim." In his reply brief, counsel for respondent said: * * * since the total payments are not in excess of $1000 it would not appear essential for the court to determine whether they constitute business rather than nonbusiness bad debts since net capital losses are fully deductible from ordinary income in an amount not in excess of $1000. The only questions that the court must decide with respect to these payments are whether the alleged debt had value after 1957 or whether it is deductible in view of petitioner's failure to enforce collection of his claim. * * * In view of our finding that any claim petitioner had against EE because of petitioner's payments as guarantor was worthless at the time the payments were made, *94 we hold petitioner is entitled to deduct the amount of $915.44 as a bad debt in 1957 under section 166, supra. Dominick J. Salomone, supra.
Decisions will be entered under Rule 50. Footnotes
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
2. (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
3. § 1.166-5 Nonbusiness debts. (b) Nonbusiness debt defined. For purposes of section 166 and this section, a nonbusiness debt is any debt other than - (1) A debt which is created, or acquired, in the course of a trade or business of the taxpayer * * * or (2) A debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c)(1). For purposes of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. * * *.
4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
5. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income * * *.↩