Stewart Supply Company, Inc. v. Commissioner.
Stewart Supply Co. v. Commissioner
Docket No. 90100.
United States Tax Court
T.C. Memo 1963-62; 1963 Tax Ct. Memo LEXIS 283; 22 T.C.M. (CCH) 246; T.C.M. (RIA) 63062; March 1, 1963
*283 Held, that amounts expended to tear out the front wall of a building occupied by petitioner, to erect a replacement wall, and to make necessary electrical connections in said new wall, are capital expenditures rather than currently deductible repair expenses. Salem G. Mansour, Esq., 1012 M & T Bldg., Buffalo, N. Y., for the petitioner. Philip Shurman, Esq., for the respondent. PIERCE *284 Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in the income tax of petitioner for the year 1957 in the amount of $6,120.78. The sole issue presented for decision is: Whether certain expenditures made to tear out the front wall of a building occupied by the petitioner, to replace said wall with a new one, and to make electrical connections in the new wall, constitute capital expenditures which would be recoverable through periodic deductions for depreciation, or whether said expenditures were made for ordinary repairs, so as to be deductible in full as an ordinary and necessary business expense of the year in which they were made. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits therein identified, is incorporated herein by reference. The petitioner, Stewart Supply Company, Inc., is a New York corporation, with its principal office and place of business in Niagara Falls, New York. It filed a Federal corporation income tax return for the calendar year 1957, with the district director of internal revenue at Buffalo. From the time of petitioner's organization in 1946 *285 to and including the year 1957 which is here involved, it carried on its business of a wholesale dealer in automotive parts, tools, supplies and equipment, in a 1-story brick building and an adjoining 2-story building, both located on Main Street in Niagara Falls. Said 1-story building had been constructed at some time prior to the year 1924. Both it and said adjoining 2-story building (which is not directly involved herein) were purchased by petitioner was [from] a predecessor proprietorship on July 1, 1946, at an aggregate cost of $16,000 of which $5,000 was allocated to the land underlying said buildings, and the balance of $11,000 was allocated to the cost of both buildings. The 1-story building here involved [1] was of a steel-reinforced brick construction; and it had a frontage of 50 feet abutting directly on the public sidewalk in front thereof, and a depth of 70 feet. The front wall of the building was topped by a parapet and decorative stone cornice, which extended about to feet above the roof line. After petitioner acquired the two buildings, it made extensive improvements and betterments thereto, including a new heating plant, new plumbing, new doorways at the rear, and *286 a new roof on the 1-story building. Also petitioner removed certain partitions, and provided space for offices. As the result of all the foregoing, which were treated as capital improvements, petitioner's cost basis for the two buildings (per its books and records) had been increased as of December 31, 1957, to approximately $63,000. During the summer of 1956, there occurred in Niagara Falls a severe wind and rain storm, which ripped off the roof of a nearby building, causing large pieces of debris to be blown onto the roof of the building involved. One or more pieces of this debris was hurled against the 10-foot high parapet that was superimposed on top of the front wall of the building. Also numerous holes were made in the then new roof. And these holes, which were the only damages then apparent were then repaired. No damage to the front wall or to the parapet was noticeable at that time. About 6 or 7 months later, in February 1957, during a period of severe cold *287 weather, petitioner's president, Gordon Stewart, noticed that the front wall of the building was separated from the building itself at the roof line; that the front wall had a crack running laterally across its entire 50-foot length at the roof line; and that the parapet was fipped, outward over the public sidewalk about 7 inches. Stewart thereupon called Jack Johnson, the construction superintendent of a contracting firm, to examine the building with a view to determining what had caused the front wall to become separated and what should be done to remedy the situation. Johnson informed Stewart that the condition apparently had been brought about by a chain of events and circumstances, which began with a crack at the bottom of the parapet where the roof met the front wall; and that this crack may have been caused by the impact of the debris blown from the nearby building during the above-mentioned storm in midsummer 1956. Thereafter rain water had apparently seeped into this crack; collected in "pockets" where the roof joists were imbedded in the front wall; and had then frozen and expanded during the February 1957 "cold spell," so as to cause the front wall to separate from the *288 roof. Johnson advised Stewart that the defective condition of the wall could be remedied in either of two ways: (1) The existing wall and parapet could be torn out, and then be replaced by a new wall; or (2) steel tie-rods could be inserted through the existing wall, run the length of the roof, and anchored at the rear of the building - which would tend to pull the existing wall back to its former position. Although the tie-rod method would have been less expensive than replacing the front wall, Johnson was of the opinion, and he so advised Stewart, that the tie-rod method would not give as satisfactory results as replacing the wall; and he accordingly recommended that the wall be replaced. Stewart accepted this recommendation; and the existing wall was thereupon torn out, and a new wall was built to replace it. The new wall was constructed of brick, as had been the old wall; but this new brick was of a different color. Show windows and a door were placed in the new wall in the same positions that show windows and a door had been in the old front wall; although the new door was recessed so as to permit it to be opened outward (rather than inward as formerly) as was required by *289 municipal building regulations. Decorative stone inserts which had been placed above the show windows in the old front wall were not replaced. The parapet on the new wall was of approximately 8 feet less height than the 10-foot parapet on the old wall; and a cap stone was placed on this new and lower parapet, much simpler in design than the decorative stone cornice on the old parapet. Petitioner expended an aggregate amount of $12,855.87 in 1957 to tear out the old wall, to construct the new wall, and to make necessary electrical connections in the new wall; and it also paid $150 for two fire doors and frames. On its return for 1957, petitioner deducted the sum of $13,005.87 ($12,855.87 plus $150) as a repair expense, but it has conceded that the just mentioned $150 of said amount is a capital expenditure which is not currently deductible. The respondent, upon audit of petitioner's return for 1957, determined that said amount of $13,005.87 was not currently deductible as "repairs," and he explained his action as follows: It is held that the installation of a new wall to front of building in the amount of $13,005.87 is capitalized as a replacement because there is a resulting *290 increase in value, with a life of over 30 years. Depreciation of $216.76 on this amount is allowed for 1/2 year. Opinion The issue in this case is whether the $12,855.87 - which petitioner expended to tear out the old front wall of one of its buildings, to erect a new replacement wall, and to make necessary electrical connections in said new wall - is to be classed as a currently deductible repair expense (as contended by petitioner), or as a capital expenditure to be recovered through periodic deductions for depreciation (as determined and here contended by respondent). Section 162(a) of the 1954 Code provides for the deduction of all ordinary and necessary business expenses of operating a trade or business; and warrant for the deduction of true repair expenses is found in that section. The regulations ( Income Tax Regs., section 1.162-4) issued under section 162, which deal with repair expenses, provide as follows: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an *291 ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. [Italics supplied.] The 1954 Code, in section 263, explicitly denies deduction for capital expenditures. In the very early case of Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106, we pointed out the distinguishing characteristics of repairs as opposed to capital expenditures for replacements, in the following language: To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating *292 condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *
The complete replacement of one of the four sides of a building, as was done by the petitioner in the instant case, is certainly no "incidental" repair. It was more than a mere mending job; it was the substitution of a new, substantial part for an old one. It entailed the expenditure of a sizeable sum of money, almost $13,000; and petitioner has not shown that the useful life of this new wall is less than the 30 years attributed to it by the respondent in his notice of deficiency. It would, in our opinion, bring about a distortion of income to charge this sum in its entirety against the revenues of *293 the one year 1957 which is here involved. We believe that the income of petitioner's business would be more clearly reflected if the amount here involved were recovered through periodic deductions for depreciation over the useful life of the new wall, so that the revenue of each year of its future life would bear a proportionate share of the cost of the benefit which the expenditures here involved conferred upon it. In this connection, we think what we said in the case of Joseph E. Hubinger, 13 B.T.A. 960, 964, affd. (C.A. 2) 36 F. 2d 724, is apposite here: We can not believe that Congress intended to allow as charges against the revenues of a day or year the cost of restoring major parts of income-producing property where the restoration is of such character as to be useful over a long period of years. The distinction between maintaining property through repairs necessitated as the result of a casualty, * * * and the restoration of a major part of the property itself, is readily apparent. * * * See to the same effect, P. Dougherty Co., 5 T.C. 791, affd. (C.A. 4) 159 F. 2d 269. Also, we are satisfied that the value of *294 the building was appreciably increased as the result of the erection of the new wall. The record contains pictorial evidence of both the 1-story building with its new front, and petitioner's adjoining 2-story building which had not the benefit of any such "face lifting." The contrast between the two buildings is striking. We are confident that the building with its brand new front would have brought a higher price than the same building with its old front. We must reject the merely conclusory statements of certain of the witnesses, that the new front did not increase the value of the property. Moreover, we believe that the installation of the new front increased the useful life of the building. Our findings shows that the building had been erected prior to 1924, so that it was at least 33 years old at the time of the erection of the replacement wall. To say that the replacement of one of the building's four 33-year old walls did not increase the useful life is to contradict common sense. Here again, we are compelled to reject the witnesses' conclusions that the useful life of the building was not prolonged. Cases involving the issue of repairs versus capital expenditures are numerous, *295 and it would unduly prolong this opinion to cite and discuss each of them. It suffices, for present purposes, to mention but a few wherein expenditures have been held to be capital in character: Ritter v. Commissioner, (C.A. 6) 163 F. 2d 1019, affirming a Memorandum Opinion of this Court (new roof); Georgia Car & Locomotive Co., 2 B.T.A. 986 (new roof); Foer Wall Paper Co., 9 B.T.A. 377 (improvements to store front); P. Dougherty Co., supra, (rebuilding of stern of a barge); and Joseph E. Hubinger, supra, (restorations of portions of building damaged by fire). Petitioner has neither pleaded nor argued that it is entitled to a deduction for a loss, with respect to the unrecovered basis, if any there was, that it may have had in the old wall which was removed. We accordingly make no decision here respecting the allowability of such a loss deduction. We decide the present issue for the respondent. Decision will be entered for the respondent. Footnotes
1. The term "the building," as used hereinafter, will have reference to the above-mentioned 1-story building, the replacement of the front wall of which is the focal point of the controversy in the instant case.↩