Munroe Land Company v. Commissioner.
Munroe Land Co. v. Commissioner
Docket No. 3720-64.
United States Tax Court
T.C. Memo 1966-2; 1966 Tax Ct. Memo LEXIS 280; 25 T.C.M. (CCH) 3; T.C.M. (RIA) 66002; January 4, 1966
*280 Petitioner constructed an industrial building in 1960, and an addition thereto in 1961. It was a Butler-type building constructed of steel and aluminum with a Butler-type roof made of painted aluminum sheeting with fiberglass batting fastened to and underneath the metal sheeting. The batting served as insulation and a vapor barrier. To serve as a vapor barrier to the interior air, it was necessary for the batting to be properly sealed and airtight. In 1962, there was condensation of the warm interior air which caused water to accumulate between the metal roof sheeting and the batting; the batting became saturated and broke, and water fell into the entire area of the building. The problem was the result of inadequate sealing of the batting when the addition to the building was constructed. Upon the advice of experts, petitioner corrected the problem by placing different insulating materials on top of the metal roof sheeting. It was not feasible or economical to fix the batting underneath the metal sheeting; the new work done achieved the same purpose. Held: The placing of insulating materials on top of the roof put the building in its former efficient operating condition, permitted *281 the continued use thereof in the same way as before, and constituted repair and maintenance work; it did not add to the value or prolong the useful life of the building and was not a capital expense. The cost of the work and materials is deductible business expense. James C. Herndon, 430 Second National Bldg., Akron, Ohio, for the petitioner. Alan E. Cobb, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income tax for the taxable year 1962 in the amount of $3,801.32. The main question is whether the nature of an expenditure in 1962, relating to fixing the roof of a building owned by petitioner, was for repairs, the cost of which was a deductible business expense under section 162, 1954 Code, or was a capital expenditure. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner, an Ohio corporation organized on April 30, 1953, has its main place of business in Cuyahoga Falls, Ohio. It filed its return for 1962 with the district director of internal revenue in Cleveland, Ohio. It keeps its books and prepares its returns on a calendar year basis under a cash method of accounting. Petitioner is engaged in the real estate *283 rental business. The issue relates to a factory building in Cuyahoga Falls which was constructed by petitioner and then leased to the Independent Machine Company, which is engaged in the business of machine tooling. During the months of March through June 1960, petitioner constructed the building involved (hereinafter called the building), which is a one-story Butler-type building made chiefly of aluminum and steel, 80 feet long by 120 feet wide, or 10,000 square feet. The cost was between $65,000 and $80,000. Most of the building is a walled, open area for factory use, without any partitions; the front part was partitioned into the office space required by the lessee in the operation of its business. When the original building was completed in June 1960, there remained, on the land area, room for a future addition to the building. The material used for the roof of the original building is corrugated, painted aluminum sheeting.032 inches thick, which is called an aluminum "skin", with insulation underneath the sheeting consisting of fiberglass batting, one inch thick, sealed to create an air-tight space between the batting and the aluminum sheeting, or skin. The underneath side *284 of the batting is covered with a thin sheet of aluminum vinyl. The fiberglass batting is supported by steel strips called purlins. The roof is held together by metal bolts which extend downward from the top side through the roof materials and are fastened underneath the fiberglass batting. During March through June 1961, petitioner constructed a one-story addition to the original building which is 120 feet wide by 120 feet long, having an area of 15,000 square feet, which cost between $65,000 and $75,000. The total cost of the building, with the addition, exclusive of the cost of the land, was $133,280.44. The addition is the same type of construction as the original part of the building, and the same type of roof was put on the addition, as described above. After the construction of the addition was completed, which extended beyond the rear wall of the original part of the building, the original rear wall was removed, so that the area of the whole building (the original and the addition) was a large open area within the 4 walls of the building, excepting the front office section. The Independent Machine Company leased and continuously occupied the whole building (original part *285 and the addition), beginning in June 1960, and did not encounter any problem relating to the construction of the building until February 1962, when a serious defect developed in the roof at the rear of the building. In February 1962, in the area where petitioner's building is located, the weather was cold and there were extreme changes in the temperature. During February, the fiberglass batting in the roof at the rear of the building began to swell, or bulge, and sag. The first area to develop this condition was near a skylight over the loading dock of the addition to the building, which is 60 feet from the rear of the building. Starting at this point, the swelling and sagging of the fiberglass insulation spread rapidly in all directions of the roof and within 2 weeks water dripped down to the floor below. The swelling spread and water dripped over the entire area of the original part of the building, the addition, and the front office area. The next development consisted of a breaking of the fiberglass batting and the pouring down of water on the factory area, the machines, materials, and workmen. It became necessary to construct temporary plastic shields above the machines for protection, *286 and to do something to overcome the condition. The condition consisted of condensation in the area between the aluminum skin of the roof and the top side of the fiberglass batting directly under the cold aluminum sheeting. The batting was not adequately sealed, therefore, it was not airtight. Warm air rising from inside the building penetrated the batting, came in contact with the cold aluminum skin, condensed, and water pockets formed. The resulting accumulation of water in the area above the batting soaked into the batting and caused it to swell, break, and release the accumulated water, which first dripped and then poured down onto the inside area of the entire building. The inadequate sealing of the batting was involved with the construction of the addition to the building in 1961. Petitioner called in representatives of roofing contractors in the latter part of February 1962 to examine and diagnose the cause of the condensation problem, and to obtain recommendations for overcoming the condition. Upon inspection of the roof it was determined that in the construction of the original part of the building in 1960, the fiberglass insulation beneath the roof sheeting had been properly *287 installed, sealed, and was airtight, so that the warm air within the building could not penetrate the insulating batting and could not come in contact with the aluminum roofing or decking sheets; but that when the addition to the building had been construted in June 1961, there had not been adequate sealing, probably around the skylights, and consequently the interior warm air had penetrated through and above the fiberglass batting causing the condensation, the forming of water pockets, and the dripping of water. Two proposals were made to petitioner for correcting the condition: The first proposal involved working on the problem from inside and underneath the roof, as the outer aluminum roof decking was determined to be perfectly adequate. This proposal would have required the removal of the fiberglass insulation, repairing and replacing the batting, and a different method of installation of the batting would be used, to eliminate the possibility of the warm air's getting between the batting and aluminum roofing. The price quoted was $14,500, which was predicated upon petitioner's removing all of the trapped water and removing and drying out the batting, and all of that work would *288 have cost about $3,000, in addition. The chief difficulty about this proposal was that in order to remove the fiberglass batting, it would have been necessary to remove all of the bolts holding the aluminum sheeting and the fiberglass in place, which, in turn, would have required the removal of the aluminum sheets. The second proposal was to apply insulating materials on the outside, top surface of the entire roof (over the whole building, original part and addition) including 36 skylights. The layers of insulating materials would prevent the aluminum sheeting's becoming cold and would thereby prevent the interior condensation of warm air and the forming of pockets of water under the roof. The quoted cost of the second proposal was $10,200. Petitioner adopted the second proposal. The actual cost, incurred and paid in 1962, was $11,863.75. The following work was done on the top of the existing aluminum roof and skylights: The 36 skylights were covered with steel sheeting. The corrugated aluminum sheeting was made level by filling in the spaces between the "ribs" with strips of Celotex material 8 inches wide and 1 1/2 inches thick. The entire, existing roof and all of the covered skylights *289 were covered with a layer, one inch thick, of fiber insulation material similar to Celotex, which then was mopped with hot asphalt. On top of the asphalt there were placed 3 layers of roofing felts with tarpaper between each layer, and the final layer was covered with a final mopping of hot asphalt, which was the final surface. All edges of the roof were suitably trimmed with galvanized sheet metal. This composition covering of the existing aluminum roof has an estimated life span of 10 years, but requires an asphalt coating, for proper maintenance, after about 5 years, and at the end of 10 years additional maintenance work is required. Under the plan that was adopted by petitioner to correct the interior condensation problem under the existing roof, the aluminum sheeting, the fiberglass batting, and the purlins holding the batting were left intact, and the fiberglass batting was not fixed but was left just as it had become as a result of the condensation condition. The application of the insulating materials onto the top of the aluminum roof cured and eliminated the interior condensation problem. The insulating materials applied on top of the roof added 50 tons in weight to *290 the entire roof. This additional weight reduced the carrying capacity of the interior crane system fastened to the structural frame of the building, so that the weight of the materials which could be carried by the crane was reduced. Also, since it was necessary to cover the 36 skylights, the only interior lighting of the building became electric lighting and all daylight was eliminated after the corrective roof work was completed. The aluminum sheeting roof on the entire building (original and addition), with the fiberglass insulation under the roof, was, in 1960 and 1961, used frequently on the type of building that petitioner constructed in 1960 and 1961, involved here. Aluminum sheeting had been used for roofing for at least 20 years previously. The type of roof installed originally by petitioner on the building is highly regarded for industrial buildings. A similar roof decking that is used on industrial buildings is corrugated steel sheeting. Steel sheeting serves just as well as aluminum sheeting but is not a better material for a roof deck. However, steel roofing sheets are much cheaper than the aluminum sheets. The steel sheets cost $15 per square (which is 100 square feet) *291 less than aluminum sheeting. The roof on the original building (aluminum sheeting with underneath fiberglass insulation, vapor sealed) was perfectly satisfactory from the time when the building was completed in June 1960 up to February 1962, as was the same type roof installed on the addition. The condensation problem was not due to inferiority in the type of the entire roof, as such. It was the method that was used in removing the original rear wall after completion of the addition that was the source of the condensation problem; during the procedure of removing the original rear wall, some vapor seals around some skylights and at other places became damaged and were not airtight vapor seals, so that warm air went into spaces throughout the roof area between the aluminum sheeting and the batting, came in contact with the cold aluminum sheeting, and condensed. The specifications for a roof of aluminum sheeting insulated underneath with fiberglass batting, covered with vinyl on the room side, do not call for the installation of any materials on the outside, top side of the aluminum sheeting, such as asphalt (tar), layers of roofing felts and tarpaper, and a final coating of asphalt, *292 which materials do not alone constitute a roof and are not strong enough to support much weight, such as that of an individual. If the vapor seals of the fiberglass insulation underneath the roof of petitioner's building had not been damaged in the course of removing a wall of the original building after the addition thereto had been completed, the felt, tarpaper, and asphalt coating would not have been put on top of the roof of the building. That method of eliminating and overcoming the unforeseen and unusual vapor condensation problem under the roof of the building was one of 2 methods of dealing with the problem; it was simpler to do and less expensive, and was preferable because it could be done on the outside of the roof. The alternative method would have been more difficult as petitioner's own employees would have had to remove, first, all of the existing fiberglass batting. The contractor then would have installed other fiberglass batting. If the original roof on the building had been of a type utilizing a top covering of felts, tarpaper, and tar coating, the aluminum rib sheets, painted with vinyl, would not have been used as the roof decking Instead, the less expensive, *293 20 gauge steel, ribbed sheets would have been used for the roof decking. Since petitioner was obliged, because of the unforeseen and unusual condensation problem, to put the felt and tarpaper covering on top of the painted, aluminum roof, as a corrective expedient, and since that covering on top of the aluminum sheeting served as an insulation of the aluminum roof, the underneath, fiberglass batting (also insulation material) proved to be an unnecessary, inside layer of insulating material after the outside layers of insulating materials were put on top of the metal roof. Therefore, the inside fiberglass batting proved to be a "loss" to petitioner after the corrective work was done. It has been stipulated that the cost to petitioner of the fiberglass batting originally installed under the aluminum roofs on both the original building and the addition thereto, was $2,889.60, which cost included all the costs of the material, labor, and installation charges. Of the total cost of the original building and addition, $133,280.44 (exclusive of the land), $23,540 is allocable as the cost of the original roof (before the work in 1962), which amount, in turn, is allocable as the cost of *294 the following: (1) Vinyl covered aluminum roof sheeting (decking), $18,240; (2) 36 plastic skylights, $2,410.40; and (3) fiberglass batting with vinyl covering, under roof decking, $2,889.60; total, $23,540. Petitioner computes the annual allowance for the depreciation of the building under the declining balance method on the basis of an estimated useful life of 33 1/3 years. Petitioner determined that the roof, as originally constructed, on the original part of the building and the addition had an estimated useful life equal to that of the building. The addition of insulation on top of the roof did not increase the building's value. In its return for 1962, petitioner deducted as repairs expense $11,863.75, the cost of the materials used and labor in adding the insulating materials to the outside of the roof of the entire building. Respondent determined that the expenditure represented a capital expense for an improvement of the building, and that it was not an expense of repairs. He disallowed the deduction; but on the basis of capitalizing the expenditure, he allowed $711.82 as an additional depreciation allowance. Ultimate Findings of Fact The work done and the materials *295 placed on the top of the roof sheeting of petitioner's building in 1962 but it in its former ordinarily efficient operating condition and permitted the continued use of the building in the same manner as before, without extending the former estimated useful life of the building, and without increasing or adding to its value. The work was in the nature of repairs and maintenance, the cost of which, $11,863.75, was an expense of repairs, and was not a capital expense for improvements or betterments. Opinion The issue is whether the addition in 1962 of the insulating materials to the roof of petitioner's building represented repairs or an improvement of the building. If the work was in the nature of repairs and maintenance, the cost, $11,863.75, is deductible in 1962 as a business expense under section 162(a), 1954 Code; but if it was in the nature of a capital improvement, the cost is not deductible and must be capitalized and recovered through annual depreciation allowances for the entire building. Section 1.162-4 of the Income Tax Regulations, upon which each party, respectively, relies, provides as follows: Section 1.162-4 - Repairs: *296 The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production, or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with Section 167 or charged against the depreciation reserve if such an account is kept. Section 263(a)(1) and (2), 1954 Code, provides: (a) General Rule. - No deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *
(2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made. Section 1.263(a)-1, Income Tax Regulations, provides: (a) *297 Except as otherwise provided in chapter 1 of the Code, no deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or (2) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made in the form of a deduction for depreciation, amortization or depletion. (b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph. The cost of incidental repairs, as defined in section 1.162-4 of the regulations, may be deducted as an expense and, thus, is a charge against operating income. The cost of repairs which are in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life *298 of the property, are capital expenditures which are recoverable "piecemeal" through depreciation deductions, or may be charged against a depreciation reserve if such an account is maintained. It is necessary, but often difficult, to distinguish between repairs (upkeep and maintenance charges) and renewals (replacements and betterments). In Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, 106, it was noted that In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase *299 its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * * See, also, Union Pacific R.R. Co. v. United States, 99 U.S. 402, 420. See, also, 4 Mertens, Law of Federal Income Taxation, Sec. 25.20, pp. 74-82, where it is noted, inter alia, that "Assuming that the expenditure is ordinary and necessary in the operation of the taxpayer's business, the answer to the question as to whether the expenditure is an allowable deduction as a business expense must be determined from the nature of the expenditure itself, which in turn depends on the extent and permanency of the work accomplished by the expenditure. The issue is a factual one." Petitioner contends that the addition of insulating materials to the roof of the building was a repair that was made to permit the continued use of the building, which did not increase the value or estimated useful life of the building, or the useful life of the original roof, and that the expenditure is a deductible expense. Respondent argues that the work on the roof constituted an improvement, that it *300 was not a repair, and that the expenditure was a capital expense. It is often difficult to determine whether work done on a building or other property is in the nature of repairs and maintenance or constitutes a capital improvement becase "the line between repairs and maintenance, and betterments and improvements is shadowy and indistinct." Black Hardware Co., 16 B.T.A. 551, 553. In many cases the distinction between a repair and a capital improvement is one of very fine degree. See Note, 13 Tax Review 231 (1958). In Plainfield-Water Co., 39 T.C. 333, 337, the distinction which this Court has made in several cases was well stated: "An expenditure which returns property to the state it was in before the situation prompting the expenditure arose, and which does not make the relevant property more valuable, more useful, or longlived, is usually deemed a deductible repair. A capital expenditure is generally considered to be a more permanent increment in the longevity, utility, or worth of the property." If the repair does not "materially add to the value of the property nor appreciably prolong its life," the cost may be deducted as an expense. *301 Section 1.162-4, Income Tax Regulations, supra (emphasis supplied). This Court and other courts have held, upon the particular facts of a case, that expenditures were in the nature of repairs, which ordinarily might be treated as capital expenses, where no increased productivity and no increase in the value and useful life of the property resulted, and where the purpose of the expenditure was to prevent the useful life of the repaired property from being shortened due to unusual circumstances. See, for example, Illinois Merchants Trust Co., Executor, supra; American Bemberg Corporation, 10 T.C. 361, affirmed per curiam 177 F. 2d 200 (C.A. 6, 1949); Midland Empire Packing Co., 14 T.C. 635, 640-643; Farmers Creamery Co. of Fredericksburg, Va., 14 T.C. 879, 882; J. H. Collingwood 20 T.C. 937, 941-943; Southern Ford Tractor Corporation, 29 T.C. 833, 844-845; Plainfield-Union Water Co., supra; Buckland v. United States, 66 F. Supp. 681; *302 Kansas City Southern Ry. Co. v. United States, 112 F. Supp. 164, to which respondent agreed in Rev. Rul. 54-356, 1954-2 C.B. 82; and Regenstein v. Edwards, 121 F. Supp. 952. Upon consideration of the evidence, it is concluded that in this case the work done on the roof of the building in 1962 was in the nature of repairs and maintenance and that the cost thereof is a deductible expense. Both the cause of the damage to the insulation batting beneath the roof sheets and the method of repairing the condition were unusual. Although in a more usual situation, the repairs would have been made directly at the location of the damaged materials, it would have been more costly and difficult to have done so in dealing with the condition under the aluminum roof on petitioner's building due to the type of roof, the Butler type. For eminently practical considerations, the repair work was done on the top of the aluminum roof sheets, rather than underneath them, at less cost, but the placing of the different insulating materials on the top side of the metal sheeting served the same purpose as would have been served if insulating material had been placed beneath *303 the sheeting, namely, to prevent condensation of warm interior air. That is to say, insulating materials beneath the roofing sheets acted as a vapor barrier which kept warm interior air from coming in contact with the cold metal roof sheeting; but the same effect was achieved if the metal roof sheeting did not become cold due to insulation on top. The work that was done and the materials that were used did not add to the value or extend the estimated useful life of the roof itself, or of the building, and did not constitute improvements or betterments. The expense incurred was for repairs to and maintenance of the roof, i.e., the roof insulation, and is deductible business expense under section 162(a). Consideration has been given to the cases cited by respondent, but the facts thereof are distinguishable from those here. The cases we have cited above are more closely in point and support the petitioner's claim. Although the facts have been stated fully, the following observations are relevant: The building is a type and design originated by the Butler concern which produces and furnishes the basic materials of steel and aluminum, fabricated at the Butler plant. The roof is a Butler-type *304 roof, an integral part of the design and structure. The vinyl painted aluminum roof sheeting, more costly than galvanized steel sheeting, does not require the maintenance of a conventional roof that is covered with tar and layers of tarpaper and roofing felts, and it has the same estimated useful life as the building, 33 1/3 years. The building is ranch style with a roof that slopes down from the center beam to two walls. There was, in 1962, nothing wrong with the aluminum roof sheets; they did not leak; and they were not damaged or in need of any repairs. But, as part of the structure of a Butlertype roof, there were bolts at frequent locations, inserted through the aluminum sheets and fiberglass batting underneath, and this fastening together of the metal sheeting and the insulating batting was the difficulty encountered when it became necessary to repair the damaged batting. The president of the petitioner (also the president of the lessee) testified: Yes, we would have to take the aluminum roof off if we were to take the [batting] insulation off. The bolt goes all the way through, so if you were going to remove the batt, you would have to take it off and therefore, you would *305 be taking off the aluminum sheets at the same time. The aluminum roof would come unfastened. Petitioner did not need to do any work on top of the aluminum roof sheeting or put any insulating materials there, and would have preferred not doing so for reasons mentioned in the Findings of Fact. A covering on the top of a vinyl painted aluminum roof, of tar, tarpaper, and felts, ordinarily is not required or used. The covering of insulating materials was put on top of, rather than under, the aluminum sheeting only because that method was as good and was less difficult and expensive than repairing the insulation batting under the roof sheets. For all practical purposes, the method used was no more than the repair which was necessitated by the damage to the batting underneath, which resulted from inadequate sealing of the batting in some places and around some of the skylights. Under the facts and circumstances of this case, it is of no significance that the roof insulation was repaired by putting the necessary insulation where it was put, on top of rather than under the aluminum sheeting. The purpose was only to repair the roof insulation, which was a necessary part of the roof. The purpose *306 was not to add an improvement or betterment to the roof; and was not to extend the estimated useful life of the roof or the building, or the value thereof. After work was done in 1962, the building did not have an improvement; it had only what was there before, an insulated, aluminum roof. The damaged batting, which was left in its damaged condition, no longer served the function of roof insulation. The insulation put on top of the roof served that function instead; and in so doing represented the necessary repair of the damaged roof insulation. Moreover, the insulating materials used had an estimated useful life of only 10 years. The work on the roof was done because of a relatively sudden and unusual factor which resulted in damage to the roof insulation, namely, the unexpected failure of the sealing of the insulation, which sealing was supposed to keep the insulation airtight. The remedial work on the roof was necessary to permit the continued use of the building in the same manner as before the damage was done to the roof insulation. The situation here is similar to that in *307 Midland Empire Packing Co., supra (see pp. 639-641), where we held that work done on the taxpayer's building represented repairs, the cost of which was a deductible business expense. We reach the same conclusion under the particular facts of this case. Decision will be entered for the petitioner.