APPEAL OF ILLINOIS MERCHANTS TRUST CO., EXECUTOR OF THE ESTATE OF WILLIAM R. MANIERRE, DECEASED.

Docket No. 3106.    Submitted August 3, 1925.    Decided May 28, 1926.

1. In 1919 the water level in the Chicago River suddenly and unexpectedly receded and thus exposed part of the foundation piles under the decedent's building. These piles immediately started to rot, which caused the wall on the river side to settle to such extent that the collapse of the building threatened. The cost of shoring up the wall and repairing the foundation was a proper deduction from gross income under section 214 (a) (1), Revenue Act of 1918.

2. The decedent's business had no good will value on March 1, 1913.

*Richard S. Doyle* and *L. Dana Latham, Esqs.*, for the petitioners.
*A. R. Marrs, Esq.*, for the Commissioner.

Before MARQUETTE and MORRIS.

This appeal is from the determination of deficiencies in income taxes for the years 1918, 1919 and 1920, in the aggregate amount of $7,643.70, being $396.15 for 1918, $1,398.49 for 1919, and $5,849.06 for 1920. The correctness of the 1918 deficiency is not in controversy.

Two questions are raised: (1) Whether certain expenditures made in 1919 and 1920 to prevent the collapse of a building were deductible from gross income, or whether they constituted capital expenditures; and (2) whether the amount of $25,000 received in 1920 on a sale of the good will of the business constituted income of that year, or whether the amount represented good will value existing on March 1, 1913.

FINDINGS OF FACT.

William R. Manierre, now deceased, was a resident of Chicago, Ill. Subsequent to February 7, 1925, he died at Chicago, and the Illinois Merchants Trust Co. was duly appointed executor of his estate.

During the years in question Manierre owned a building, known as Central Warehouse, located on the west bank of the south branch of the Chicago River. It was a brick building, having seven stories above the basement, and rested on a so-called floating foundation of wooden piles.

Prior to 1919 all the foundation piles on the river's edge were completely submerged. During that year, owing to the sudden and unexpected lowering of the water level, the ends of some of the piles on which the building rested were exposed to the action of the air and the other elements. Dry rot of the exposed portions immediately set in, and in 1919 the wall on the river side of the warehouse settled so materially that the entire building threatened to collapse.

To prevent its total loss and to arrest further damage to the structure, it was necessary to saw off the rotted piles at a point below the new water level and to insert concrete supports between the ends of the submerged piles and the floor of the building. This work required the removal of a large portion of the ground floor. It was also necessary to shore up and raise, so far as possible, the partially collapsed wall.

For those repairs the decedent expended during 1919 the sum of $9,000, and during 1920, $37,562.06. The work done did not prolong the original estimated life of the building, nor did it increase its value. In computing his net taxable income the decedent deducted those amounts from his gross income in the respective years.

During 1920 decedent leased the warehouse to J. L. Kraft & Brothers Co., of Chicago, and received, over and above the agreed rental, the sum of $25,000 in cash. The lease contained the following provision relating to the sale of good will:

And the lessee hereby covenants and agrees in addition to pay to the said lessor the sum of $25,000.00 in cash on or before the expiration of 30 days from the execution hereof as purchase price for the good will and storage business now in operation in said building.

The taxpayer duly turned over to the lessee all contracts of storage then in effect and permitted the lessee to use the name " Central Warehouse."

The Commissioner added the entire $25,000 to the decedent's income for 1920.

Prior to 1920, Manierre had specialized in the warehousing of tea and coffee. The Central Warehouse, William Manierre, Proprietor, was known throughout the world in the tea and coffee industry. No other warehouse in Chicago had equal facilities for warehousing, blending, grading, polishing and packing tea and coffee. The principal competitor shipped his teas to the Central Warehouse for packing, cutting and polishing.

The decedent was over 80 years of age at his death, and, in the more recent years prior to his retirement, he had not kept pace with modern warehousing methods. The warehouse was not as profitable from 1914 to 1920 as it might have been, because of the failure to install a sprinkler system and other improvements. The insurance rate on goods stored in the warehouse was $1.05 per hundred pounds; the rate on goods in warehouses having modern sprinkling systems was 40 cents per hundred pounds. Also, owing to decedent's failure during these years to conduct his business on more modern lines, he was able to charge but 50 per cent of the legal storage rate. Despite the increased cost of doing business between 1913 and 1920, there was no increase in his storage rates during this time.

In 1915, one Smith, who for twenty years prior thereto had been decedent's manager, left his employment and took a similar position with a competing warehouse. Some of the decedent's customers left him and went to Smith's new employer.

In 1919, Manierre was offered $50,000 for the good will of his business.

His cash book showed:

| Year. | Annual Receipts. | Disburse- ments. | Apparent Profits. | Apparent Losses. |
|---|---|---|---|---|
| 1907 | $36,224.74 | $35,315.14 | $909.60 | |
| 1908 | 38,185.89 | 34,810.67 | 3,375.22 | |
| 1909 | 33,595.09 | 33,839.89 | | $244.80 |
| 1910 | 35,805.43 | 34,997.65 | 807.78 | |
| 1911 | 32,315.09 | 30,943.78 | 1,371.31 | |
| 1912 | 29,913.72 | 31,074.47 | | 1,160.75 |

Average annual profits 1907–1912, $843.06.

| Year. | Annual Receipts. | Disburse- ments. | Apparent Profits. | Apparent Losses. |
|---|---|---|---|---|
| 1913 | $32,391.11 | $33,195.63 | | $804.42 |
| 1914 | 36,417.83 | 35,019.10 | $1,398.73 | |
| 1915 | 40,462.54 | 35,158.53 | 5,304.01 | |
| 1916 | 38,839.82 | 36,798.00 | 2,041.82 | |
| 1917 | 36,391.29 | 35,359.39 | 1,031.90 | |
| 1918 | 32,366.62 | 37,825.33 | | 5,458.71 |

The storage warehouse business had no good will value on March 1, 1913.

### OPINION.

MORRIS: The taxpayer claims the sums expended on the building are deductible, under section 214 (a) (1) of the Revenue Act of 1918, as ordinary and necessary expenses of carrying on business. The Commissioner contends that they are capital expenditures and therefore not deductible. In support of their contrary contentions

both parties rely on article 103 of Regulations 45, which reads as follows:

The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, provided the plant or property account is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property should be charged against the depreciation reserve.

The taxpayer cites the first sentence, while the Commissioner emphasizes the second. We do not doubt the soundness of the article in question, nor do we think that the two sentences are inconsistent. We are of the opinion, however, that the Commissioner has incorrectly applied it to the facts in this appeal.

It will be noted that the first sentence of the article relates to repairs, while the second sentence deals in effect with replacements. In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. We have already pointed out this distinction in the *Appeal of Simmons & Hammond Manufacturing Co.*, 1 B. T. A. 803, in which we held that expenses properly chargeable to capital account include those which are incurred in the original construction of the work and in the subsequent enlargement and improvement thereof, and quoted the following from *Union Pacific R. R. Co.* v. *United States*, 99 U. S. 402, page 420:

Theoretically, the expenses chargeable to earnings include the general expenses of keeping up the organization of the company, and all expenses incurred in operating the works and keeping them in good condition and repair; whilst expenses chargeable to capital include those which are incurred in the original construction of the works, and in the subsequent enlargement and improvement thereof.

Applying these principles to the facts in the instant appeal, we find that, due to the sudden lowering of the water level in the south branch of the Chicago River, the upper ends of certain piles upon

which Manierre's building rested were exposed to the air, with the result that dry-rot of the exposed parts immediately set in. The wall on the river side settled so materially that the entire building threatened to collapse. In order to keep it in serviceable condition, it was necessary to saw off the rotted piles at a point below the new water level and to insert concrete supports between the ends of the submerged piles and the floor of the building and raise the river wall. This work obviously did not arrest the normal deterioration. The Commissioner contends, however, that it did appreciably prolong the life of the property, and therefore denies the deduction under the second sentence of the above article. In our opinion the import of that language is plain and does not warrant the construction placed upon it by the Commissioner. The life of the property therein referred to relates to its probable, normal, useful life for the purpose of the allowance for the return of the capital investment. There is no question but that by this expenditure the life of the building was prolonged over what it would have been after the sudden lowering of the water level in the river, but any repair increases the useful life of property over what it would have had without the repair, and hence the Commissioner's construction would prohibit the deduction of any such expenditure. The evidence is clear that the normal, useful, expected life of this building was not increased. On the contrary, it was shortened because the building was still " ruptured and cracked," even after the work was done. We are therefore of the opinion that the second sentence of article 103 does not bar the deduction of this expenditure.

The Commissioner does not dispute that these were necessary expenses, but he insists they were not ordinary. This word is defined in Webster's New International Dictionary as follows: "(1) According to established order; methodical; settled; regular; (2) Common; customary; usual." The work done was in the nature of repairs for the purpose of keeping the property in a serviceable condition. Expenditures of that character are commonly recognized and accepted as ordinary business expenses. We think article 103 of Regulations 45 correctly interprets section 214 (a) (1) of the Revenue Act of 1918 in providing that repairs which " neither materially add to the value of the property nor appreciably prolong its life * * * may be deducted as expense, provided the plant or property account is not increased * * * ". The evidence shows that these expenditures did not add to the value or prolong the expected life of the property over what they were before the event which made the repairs necessary occurred.

The remaining question is the value on March 1, 1913, of the good will of the storage warehouse business which was sold in 1920 for

$25,000. The Commissioner claims that it had no value and added the entire $25,000 to income.

We agree with his conclusion. The decedent's cash book shows that from the year 1907 to 1912, inclusive, the average annual profits were $843.06, and that for the years 1912 and 1913 there were losses of $1,160.75 and $804.42, respectively. The decedent owned the building in which the business was transacted, and although we are not informed of the amount of his investment therein, it was a substantial building of seven stories above the basement. It would therefore appear that the average earnings for the above years were not even a fair return upon his tangible assets. Considering this in connection with the fact that losses were sustained during the years 1912 and 1913, we are unable to ascribe any value to the good will of the business as of March 1, 1913, and therefore conclude that the $25,000 received for good will in 1920 should be included in the decedent's gross income.

We do not hold that a value of good will can be evidenced only by the earnings in excess of a reasonable return upon the tangible assets. The taxpayer has introduced no other convincing evidence of such value and none from which such value can be adduced.

*Order of redetermination will be entered on 10 days' notice, under Rule 50.*