OBERMAN MANUFACTURING COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4322–65. Filed February 8, 1967.

472

*Irving Rosenzweig* and *Alvin M. Stein*, for the petitioner.
*Charles G. Barnett*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the taxable year ended December 1, 1962, in the amount of $37,126.44. Also involved are the taxable years ended November 28, 1959, December 3, 1960, December 2, 1961, and November 30, 1963, but only for the purpose of establishing the amount of the net operating loss deduction to which the petitioner is entitled for the taxable year ended December 1, 1962. The issues presented for decision relate to (1) the amount of the deductions to which the petitioner is entitled on account of vacation pay; and (2) the deductibility, for the taxable year ended December 2, 1961, of an amount expended by petitioner in connection with the roof of its factory building and claimed as a business expense.

FINDINGS OF FACT

The petitioner is a corporation organized on July 2, 1932, under the laws of the State of Missouri. Prior to 1962 its principal place of business was Jefferson City, Mo.; since 1962 its principal place of business has been Memphis, Tenn. At all times pertinent hereto the petitioner kept its books and records and prepared its income tax returns on an accrual method of accounting and on the basis of a 52–53-week taxable year ending on the Saturday nearest to November 30. It filed its Federal income tax return for the taxable year ended December 1, 1962, with the district director of internal revenue, Nashville, Tenn.

The petitioner is engaged in the business of manufacturing men's clothing, and maintains and operates a sales office in New York, N.Y., and six manufacturing plants located in Memphis, Tenn.; Valdosta, Ga., and the cities of Fayetteville, Harrison, Arkadelphia, and Morrellton in Arkansas.

Commencing with its taxable year ended in November 1953, the petitioner has been a party to collective-bargaining agreements with the Amalgamated Clothing Workers of America, local 62, such agreements covering all production and maintenance workers employed at the petitioner's manufacturing plants. The following provisions are representative of the portions of such agreements dealing with vacations with pay:

Section 1. The Company will grant one (1) week's vacation with pay for forty (40) hours to all employees who, as of the date when the vacation is scheduled in each year of this agreement, have at least one (1) year's continuous service with the Company, and will grant two (2) weeks' vacation with eighty (80) hours' pay to all employees who, as of the same date, have at least three (3) years of continuous service with the Company.

Under the foregoing provisions it is understood that to be eligible an employee must be in the employ of the Company at the time of the vacation and that even though other requirements for eligibility set forth in this Article appear to have been met, if the employment relationship of any person is terminated before the vacation is taken, then such person is not eligible for vacation.

To expedite prompt issuance of vacation checks, eligibility will be determined as of the end of the pay period immediately preceding the pay period before the vacation.

Section 2. Employees who have not worked at least eighty-eight and one half percent (88½%) of the hours when work was available to said employees, in the year before the above eligibility date, shall not be eligible for such vacation. The Company will make every effort to provide work for those employees who have not earned a vacation. If the Company is unable to provide work for ineligible employees, such unemployment shall constitute an involuntary layoff.

Section 3. Employees otherwise eligible will not become disqualified from vacations because of absence due to illness (not including pregnancy) proved by a doctor's certificate, subject to review by a physician designated by the Company.

Section 4. The Company shall designate the first two (2) weeks in July as the vacation period. * * *

Similar provisions, covering some of the petitioner's employees, have been contained in collective-bargaining agreements since the mid-1940's.

Commencing with the taxable year ended in November 1953, all of petitioner's employees entitled to paid vacations under the terms of the collective-bargaining agreements, with the exception of certain maintenance employees, took their vacations during the first 2 weeks in July following the end of the vacation year, which was a 12-month period commencing on June 1. An employee's eligibility for vacation

with pay, except for the requirement that he be in the employ of the petitioner at the time of the vacation, was determined as of June 1 preceding the time for taking the vacation. Since the vacation year was a 12-month period commencing on June 1 of each year, the petitioner's taxable year included one-half of each of 2 vacation years.

At the beginning of each vacation year the petitioner made what it considered a reasonable estimate of the amount which it would have to pay on account of vacations for the ensuing vacation year. This was based upon experience of prior years as shown by its records, and there was also taken into consideration various factors which might be anticipated to affect the amount of vacation pay that would actually be paid, including the possibility of pay increases prior to the time for taking the vacations. The petitioner then accrued on its books 1/12 of such amount in each month of the vacation year.

In its Federal income tax return for each year the petitioner deducted the amount which had been so estimated and accrued for vacation pay at the end of the taxable year for the first 6 months of the current vacation year (which coincided with the last 6 months of the taxable year). It also deducted on account of vacation pay for the first 6 months of the taxable year an amount computed by subtracting from the amount of vacation pay actually paid in July of the current taxable year for the whole preceding vacation year the amount which, at the end of the preceding taxable year, had been accrued and deducted for the first-half of such preceding vacation year.

The petitioner has, since the mid-1940's, employed the above method of recording and deducting vacation pay with respect to those of its employees covered by collective-bargaining agreements, and such method has been reflected in its financial statements, tax returns, and annual reports filed with the Securities and Exchange Commission. Its books and records were audited and reviewed throughout the years by independent certified public accountants retained by it.

The following tabulation shows the amount of vacation pay claimed as a deduction by the petitioner in its Federal income tax returns for the taxable years ended in 1954 and 1955 and 1958 through 1963:

| Taxable year ended— | Unpaid vacation pay accrued as of preceding taxable year | Vacation pay actually paid during taxable year | Unpaid vacation pay accrued at end of taxable year | Total deductions claimed for vacation pay for taxable year |
|---|---|---|---|---|
| Nov. 28, 1954 | $36,763.84 | $74,845.73 | $30,195.10 | $68,276.99 |
| Dec. 3, 1955 | 30,195.10 | (1) | 54,308.53 | (1) |
| Nov. 29, 1958 | 39,611.98 | 91,444.40 | 18,551.85 | 70,384.27 |
| Nov. 28, 1959 | 18,551.85 | 97,036.99 | 74,770.68 | 153,255.82 |
| Dec. 3, 1960 | 74,770.68 | 116,779.02 | 70,118.00 | 112,126.34 |
| Dec. 2, 1961 | 70,118.00 | 107,858.20 | 53,953.00 | 91,693.20 |
| Dec. 1, 1962 | 53,953.00 | 93,692.00 | 71,989.00 | 111,728.00 |
| Nov. 30, 1963 | 71,989.00 | 126,559.40 | 71,397.00 | 125,967.40 |

1 Amount not shown by record.

In the notice of deficiency the respondent disallowed for the taxable year ended November 28, 1959, the amount of $74,770.68 claimed by the petitioner as accrued but unpaid vacation pay, but allowed the remainder, $78,485.14, of the amount claimed as a deduction on account of vacation pay. His explanation was that at November 28, 1959, the petitioner was not liable for any unpaid vacation pay.

The respondent disallowed for the taxable year ended December 3, 1960, the amount of $70,118 claimed as accrued but unpaid vacation pay, but allowed the remainder, $42,008.34, of the amount claimed as a deduction on account of vacation pay. He also allowed the petitioner a deduction of $74,770.68 which he determined had been erroneously accrued as of the close of the preceding taxable year.

He disallowed for the taxable year ended December 2, 1961, the amount of $53,953 claimed as accrued but unpaid vacation pay, but allowed the remainder, $37,740.20, of the amount claimed as a deduction on account of vacation pay. He also allowed the petitioner a deduction of $70,118 which he determined had been erroneously accrued as of the close of the preceding taxable year.

He disallowed for the taxable year ended December 1, 1962, the amount of $71,989 claimed as accrued but unpaid vacation pay, but allowed the remainder, $39,739, of the amount claimed as a deduction on account of vacation pay. He also allowed the petitioner a deduction of $53,953 which he determined had been erroneously accrued as of the close of the preceding taxable year.

He disallowed for the taxable year ended November 30, 1963, the amount of $71,397 claimed as accrued but unpaid vacation pay, but allowed the remainder, $54,570.40, of the amount claimed as a deduction on account of vacation pay. He also allowed the petitioner a deduction of $71,989 which he determined had been erroneously accrued as of the close of the preceding taxable year.

The petitioner's plant in Fayetteville, Ark., was devoted to the manufacture of men's and boys' wear. Such plant and the premises on which it is located are held by the petitioner under a lease agreement dated October 7, 1954. The lease provides for an initial term of 15 years, commencing when the plant was ready for occupancy by the petitioner, which was December 15, 1955, and further provides that such term may be extended at the petitioner's option for three successive periods of 5 years each. The annual rental during the initial term of the lease is $30,324, the petitioner being required to pay 2 years' rent in advance as security for the performance of its lease obligations. The lease provides in part:

The Tenant covenants throughout the term of this Lease and any renewal term, at the Tenant's sole cost and expense, to take good care of the demised premises, including the buildings and improvements now or at any time erected thereon, the equipment, fixtures, motors and machinery thereof, and the side-

walks, curbs, roadways, parking areas, fences and vaults, if any, and to keep the same in good order and condition, and shall promptly at the Tenant's own cost and expense make all necessary repairs, interior and exterior, structural and non-structural, ordinary as well as extraordinary, foreseen as well as unforeseen. When used in this Article, the term "repairs" shall include replacements or renewals when necessary, and all such repairs made by the Tenant shall be equal in quality and class to the original work. * * *

The petitioner occupied the Fayetteville factory shortly after January 1, 1956. The building was a one-story building, about 200 by 300 feet, containing an area of about 57,000 square feet of manufacturing space. No defect was apparent in the structure until 1958 or 1959, when the roof began to leak. The subcontractor who constructed the roof repaired the leaks, but other leaks subsequently occurred at different parts of the roof. These leaks on occasion resulted in damage to the petitioner's products and prevented the use of certain portions of the building. After having made repairs to the roof approximately five or six times a year from 1958 or 1959 until 1961, without charge to the petitioner, the roofing subcontractor and the general contractor of the building refused to make further repairs.

The roof was built of sections of steel decking covered with a roofing material called perlite and built up with asphalt and gravel. The roof did not contain an expansion joint, and when the perlite expanded and contracted due to temperature changes, cracks developed in the perlite. Water seeped through the cracks in the perlite and the cracks where the sections of steel decking abutted and onto the floor of the plant.

In 1961 the petitioner contacted a roofing expert who submitted proposals for correcting the leakages. The petitioner accepted the proposal which the expert recommended as the most economical way to solve the problem. In the middle of November 1961, the work on the roof was completed. Such work consisted of the removal of the asphalt, gravel, and perlite (leaving the basic steel decking intact), the insertion of a wood-framed copper-covered roof expansion joint running the length of the building, and the covering of the whole with a layer of ½-inch fiberboard insulation and a 20-year, 4-ply asphalt and gravel top. Thereafter the roof did not leak. The only purpose which the petitioner had for having this work done was to correct the leakage.

On November 22, 1961, petitioner paid $20,791 for the above roofing work. It had no claim under any insurance policy for reimbursement of such amount. It entered suit in court against the contractor and roofing subcontractor, but abandoned the action in October 1963, on the advice of its attorneys that it did not have a cause of action because the roof had been constructed in accordance with the construction plans and specifications.

In its income tax return for the taxable year ended December 2, 1961, the petitioner claimed the amount of $20,791 as a deduction. In the

notice of deficiency the respondent disallowed this claimed deduction with the following explanation:

In your return for the year December 4, 1960, to December 2, 1961, you deducted expense of $20,791.00 for replacement of roof on real estate property. It is determined that the amount represents a capital expenditure to be amortized over the remaining life of the lease from December 1, 1961, of 109 months. Taxable income is accordingly increased in the amount of $20,791.00.

OPINION

The petitioner contends that the respondent erred in disallowing the deductions of amounts of unpaid vacation pay which it accrued as of the end of each of its taxable years. It is its position that the amounts which it accrued represented present liabilities, payment of which could be obviated only by conditions subsequent. The respondent, on the other hand, contends that these amounts as of the end of each year were not proper accruals since the liability therefor had not become fixed.

We agree with the respondent. Under an accrual method of accounting the deduction of an item depends upon whether all the events have occurred which determine the liability of the taxpayer to pay it. A liability does not accrue as long at it remains contingent, and the fact that an amount which will be paid can be estimated with reasonable accuracy is not sufficient to support accrual thereof. *United States v. Anderson,* 269 U.S. 422; *Brown v. Helvering,* 291 U.S. 193; and *Denver & Rio Grande Western Railroad Co.,* 38 T.C. 557. The amounts here in question did not represent fixed liabilities as of the end of the taxable years, in view of the provisions of the petitioner's collective-bargaining agreements. Under such agreements the petitioner's liability for vacation pay with respect to any individual employee was contingent upon the employee's having worked during the vacation year at least 88½ percent of the working hours made available to him by the petitioner. This condition could not have been satisfied until well after the close of the petitioner's taxable year, since the current vacation year did not end until June 1 following the close of the taxable year. *Turtle Wax, Inc.,* 43 T.C. 460. This was not a condition subsequent, but was a condition precedent to the existence of a liability.

The petitioner cites I.T. 3956, 1949-1 C.B. 78, in which the position was taken that vacation pay was properly accruable as of the end of the years in which qualifying services were rendered, even though actual payment was conditioned upon the employee's being employed at the time of the scheduled vacation period. However, that I.T. has no application here since, at the end of the petitioner's taxable year, the employees had not performed the qualifying service necessary under the collective-bargaining agreements. For the same reason

section 97 of the Technical Amendments Act of 1958, as amended by Pub. L. 89–692 (Oct. 15, 1966) is not applicable.[1]

In view of the foregoing, we hold that the respondent did not err in his determination that the amounts in question did not constitute proper accruals as of the end of the taxable years.

The petitioner next contends that if, as we have held, the respondent was correct in his determination that the petitioner was in error in accruing the amounts in question as of the end of each of the taxable years, the respondent's determination amounted to a change in the petitioner's method of accounting initiated by the respondent, within the purview of section 481 of the Internal Revenue Code of 1954, as amended by the Technical Amendments Act of 1958.[2] It contends that the respondent erred in failing to allow it a deduction of $18,551.85 for the year of change, the taxable year ended November 28, 1959, since under such new method of accounting such amount constituted an improper accrual for the preceding taxable year, but is deductible in the year of change. On brief the respondent concedes that his determination constituted a change, initiated by him, of petitioner's method of accounting[3] in that it constituted a change in the treatment of a material item. See *Fruehauf Trailer Co.*, 42 T.C. 83, affd. (C.A. 6) 356

[1] Sec. 97 as so amended provides:

Deduction under section 162 of the Internal Revenue Code of 1954 for accrued vacation pay, computed in accordance with the method of accounting consistently followed by the taxpayer in arriving at such deduction, shall not be denied for any taxable year ending before January 1, 1969, solely by reason of the fact that (1) the liability for the vacation pay to a specific person has not been clearly established, or (2) the amount of the liability to each individual is not capable of computation with reasonable accuracy, *if at the time of the accrual the employee in respect of whom the vacation pay is accrued has performed the qualifying service necessary under a plan or policy* (communicated to the employee before the beginning of the vacation year) which provides for vacations with pay to qualified employees. [Emphasis added.]

[2] Sec. 481 of the Code, as so amended, provides in part as follows:

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

Sec. 7851(a)(1)(A), I.R.C. 1954, provides that ch. 1 (of which sec. 481 is a part) shall apply only with respect to taxable years beginning after Dec. 31, 1953, and ending after the date of the enactment of such Code (Aug. 16, 1954).

[3] The petitioner contends that the effect of the respondent's determination was to change the method of accounting for vacation pay from an accrual to the cash method. The respondent on brief denies that the effect of his determination is to place the petitioner on the cash method of accounting with respect to vacation pay, but does concede that he did require a change in the treatment of this item and that hence it amounted to a change in the petitioner's method of accounting. For present purposes, we find it unnecessary to resolve that question. It is sufficient to state that we are satisfied that the change in the treatment initiated by the respondent was a change in the treatment of a material item, and therefore constituted a change in the petitioner's method of accounting.

F. 2d 975, certiorari denied 385 U.S. 822; and sec. 1.481–1, of the Income Tax Regs.[4] He also concedes that under the new method of accounting he erred in failing to allow for the year of change the deduction of the amount of $18,551.85. He further concedes that under section 481 (a) (2) of the Code, he is precluded from making any adjustment for the year of change on account of the $18,551.85 item which had been accrued and deducted for the preceding taxable year, since any adjustment on account thereof would, under the statute and section 1.481–3 of the Income Tax Regulations, be deemed an adjustment in respect of pre-1954 Code years.

---

[4] Sec. 1.481–1 provides in part as follows :

* * * *Adjustments in general.*

(a) (1) * * * A change in method of accounting to which section 481 applies includes a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item. * * * In computing taxable income for the taxable year of the change, there shall be taken into account those adjustments which are determined to be necessary solely by reason of such change in order to prevent amounts from being duplicated or omitted. The "year of the change" is the taxable year for which the taxable income of the taxpayer is computed under a method of accounting different from that used for the preceding taxable year.

(2) Unless the adjustments are attributable to a change in method of accounting initiated by the taxpayer, no part of the adjustments required by subparagraph (1) of this paragraph shall be based on amounts which were taken into account in computing income (or which should have been taken into account had the new method of accounting been used) for taxable years beginning before January 1, 1954, or ending before August 17, 1954.

(b) The adjustments specified in section 481(a) and this section shall take into account inventories, accounts receivable, accounts payable, and any other item determined to be necessary in order to prevent amounts from being duplicated or omitted.

(c) (1) The term "adjustments", as used in section 481, has reference to the net amount of the adjustments required by section 481(a) and paragraph (b) of this section. In the case of a change in the over-all method of accounting, such as from the cash receipts and disbursements method to an accrual method, the term "net amount of the adjustments" means the consolidation of adjustments (whether the amounts thereof represent increases or decreases in items of income or deductions) arising with respect to balances in various accounts, such as inventory, accounts receivable, and accounts payable, at the beginning of the taxable year of the change in method of accounting. With respect to the portion of the adjustments attributable to pre-1954 Code years, it is immaterial that the same items or class of items with respect to which adjustments would have to be made (for the first taxable year to which section 481 applies) do not exist at the time the actual change in method of accounting occurs. For purposes of section 481, only the net dollar balance is to be taken into account. In the case of a change in the treatment of a single material item, the amount of the adjustment shall be determined with reference only to the net dollar balances in that particular account.

    *        *        *        *        *        *        *

(3) If the change in method of accounting is not voluntary (that is, not initiated by the taxpayer), then only the adjustments required by section 481(a) which are attributable to taxable years subject to the Internal Revenue Code of 1954 are taken into account in computing taxable income for the taxable year of the change. * * *

Sec. 1.481–3 of the Income Tax Regulations provides in part :

* * * Adjustments attributable to pre-1954 Code years where change was not initiated by taxpayer.

If the adjustments required by section 481(a) and § 1.481–1 are attributable to a change in method of accounting which was not initiated by the taxpayer, no portion of any adjustments which is attributable to pre-1954 Code years shall be taken into account in computing taxable income. * * * The portion of the adjustment which is attributable to pre-1954 Code years is the net amount of the adjustments which would have been required if the taxpayer had changed his method of accounting in his first taxable year which began after December 31, 1953, and ended after August 16, 1954. * * *

The petitioner, however, contends that not only is it entitled to deduct in the year of change the item of $18,551.85 without any adjustment, but that it is also entitled to an additional deduction of $11,643.25. Its argument is that section 481(a)(2), by prohibiting adjustment for pre-1954 Code years, froze the benefit which a taxpayer would realize from a change of accounting method initiated by the respondent; that this benefit is the amount which the taxpayer would have enjoyed had the respondent initiated the change in its method of accounting in the first year to which the 1954 Code applied, namely, the taxable year ended December 3, 1955 (citing sec. 1.481–3, Income Tax Regs. which states that the portion of the adjustment which is attributable to pre-1954 Code years is the net amount of the adjustments which would have been required if the taxpayer had changed his method of accounting in his first taxable year governed by the 1954 Code); that such benefit is the $30,195.10 which had been accrued and deducted for the taxable year ended November 28, 1954, but which would have been allowable as a deduction for the taxable year ended December 3, 1955, despite the duplication; that therefore section 481(a)(2) requires an adjustment in the taxable year ended November 28, 1959, in the full amount of the $30,195.10 in order to prevent the omission of a deduction to which the petitioner is entitled; and that the proper result is to be reached by allowing the petitioner, in addition to the deduction of $18,551.85, a deduction in the amount of $11,643.25 (the difference between the $30,195.10 and the $18,551.85).

We cannot agree that section 481(a)(2) provides for such a benefit to the taxpayer. The statute provides that in computing the taxpayer's taxable income for the year of the change there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted. In the instant case the only adjustment for the year of the change which would be necessary to prevent amounts from being duplicated or omitted would be the elimination of the deduction of $18,551.85, which had already been deducted for the preceding taxable year.[5] However, this adjustment, as admitted by the respondent, would constitute an adjustment in respect of pre-1954 Code years and is therefore not to be taken into account, but there remains no further adjustment for the year of the change to which the limitation of section 481(a)(2) can apply.

---

[5] In S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 307, it was stated:

"If there is a change in the method of accounting employed in computing taxable income from the method employed for the preceding taxable year, adjustments must be made in order that every item of gross income or deduction is taken into account and that none are omitted. At the same time no item is to affect the computation of taxable income more than once. It is only those omissions or doubling ups which are due to the change in method which must be adjusted."

We do not agree that section 481(a)(2) requires any adjustment for the year of change to prevent the omission of a deduction to which the petitioner is entitled. The petitioner is not deprived of any vacation pay deduction to which it is entitled. Indeed as a result of the change in method initiated by the respondent, the petitioner will have the benefit of a duplication of deductions on account of vacation pay to the extent of $18,551.85.

The respondent's determinations with respect to deductions on account of vacation pay are approved for each of the taxable years involved except to the extent that he failed to allow a deduction of $18,551.85 for the taxable year ended November 28, 1959. The amount of the net operating loss deduction to which the petitioner is entitled for the taxable year ended December 1, 1962, will be computed in the recomputation under Rule 50, giving effect to the foregoing.

The respondent held that the amount of $20,791 expended by the petitioner on November 22, 1961, for inserting an expansion joint in the roof of its leased premises and in removing and replacing the roof-covering material constituted a capital expenditure, and hence was not deductible in the taxable year ended December 2, 1961. The petitioner, on the other hand, contends that the work done constituted repairs to the roof of the leased building and that the cost is deductible as an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code of 1954.

Section 1.162–4 of the Income Tax Regulations provides:

* * * Repairs.

The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

Section 1.162–11(b) of such regulations provides in part:

*Improvements by lessee on lessor's property.* (1) The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. * * *

Section 263(a)(1) of the Internal Revenue Code of 1954 provides in part as follows:

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

Section 1.263(a)–1 of the Income Tax Regulations, promulgated thereunder, provides in part as follows:

* * * Capital expenditures; in general.

(a) Except as otherwise provided in chapter 1 of the Code, no deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate, or

\* \* \* \* \* \* \* \*

(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures * * *

We have heretofore taken the position that it is necesary to take into consideration the purpose for which an expenditure is made in order to determine whether such expenditure is capital in nature or constitutes a current expense. In *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103, it was stated:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

See also *American Bemberg Corporation*, 10 T.C. 361, affd. (C.A. 6) 177 F. 2d 200; and *Plainfield-Union Water Co.*, 39 T.C. 333.

We think that the expenditure in question should properly be considered as a deductible ordinary and necessary business expense rather than a capital expenditure. The testimony establishes that the petitioner's only purpose in having the work done to the roof was to prevent the leakage and thus keep the leased property in an operating condition over its probable useful life for the uses for which it was acquired, and not to prolong the life of such property, increase its value, or make it adaptable to a different use. There was no replacement or substitution of the roof. It is true that the work included some structural change, namely, the insertion of an expansion joint in the roof. However, the evidence establishes that was the most economical way to repair the leaks and thus keep the leased property in an ordinarily efficient operating condition. Nor in our opinion did

the work materially add to the value of the property, within the meaning of the regulations. As we stated in *Plainfield-Union Water Co., supra*, any properly performed repair adds value as compared with the situation existing immediately prior to the repair, but the proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure. When the petitioner leased the property the roof was free of leaks and so continued for 2 or 3 years. The expenditure which the petitioner made merely restored it to that condition.

We hold that the respondent erred in failing to allow the deduction of $20,791.

*Decision will be entered under Rule 50.*