JEROME S. MOSS AND SANDRA MOSS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Moss v. Commissioner
Docket Nos. 5571-82, 5572-82, 5573-82.
United States Tax Court
T.C. Memo 1986-128; 1986 Tax Ct. Memo LEXIS 480; 51 T.C.M. (CCH) 742; T.C.M. (RIA) 86128; March 31, 1986; REVERSED October 28, 1987 *480 Petitioners are the owners of a hotel through their respective partnership interests. The hotel was leased to another partnership who, in turn, subleased the property for management purposes. Prior to the taxable year in issue, the sublessee of the hotel and its guarantor suffered financial difficulties. Substantial repairs, maintenance and capital improvements were not performed on the hotel for several years. The guarantor was released from its obligations and petitioners entered into a new agreement with respect to the hotel's management. Incorporated directly within the new management agreement and set forth as a condition to its execution was the establishment of a $2 million program of capital improvements and refurbishings, including repairs and maintenance. The actual work performed encompassed the complete remodeling of a substantial portion of the hotel, including a majority of the guest rooms as well as public areas, such as the hotel lobby, ballrooms, meeting rooms, restaurants and bar. Petitioners deducted a total of approximately $400,000 as expenses attributable to repairs and maintenance ($270,268 for the taxable year in issue), and amortized approximately $1,500,000 *481 as capital expenditures. Held, respondent properly denied petitioners' deduction of expenses attributable to hotel repairs and maintenance as ordinary and necessary business expenses. The expenditures incurred for repairs must be amortized as incidental to a plan of capital improvements of the hotel property. John C. Fossum and Dana E. Miles, for the petitioners. Pamela R. Piland, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable year ended December 31, 1976 in these consolidated cases by separate notices of deficiency, each dated December 24, 1981, as follows: Docket No.
Petitioner(s)
Deficiency
5571-82
Jerome S. Moss and
Sandra Moss
$60,725
5572-82
Sharon M. Alesia
27,785
5573-82
Herb Alpert and
Lani Alpert
26,687
After concessions, [2] *482 the sole issue for decision is whether certain expenditures incurred in the 1976 taxable year totaling $270,268 are deductible under section 162 [3] as ordinary and necessary repairs or must be depreciated under section 263 as capital expenditures pursuant to a general plan of capital improvements. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners filed timely Federal income tax returns for the 1976 taxable year with the Internal Revenue Service Center in Fresno, California. Petitioners Jerome S. and Sandra Moss and Herb and Lani Alpert resided in Los Angeles, California, and petitioner Sharon M. Alesia resided in Beverly Hills, California at the time they filed their petitions in these consolidated cases. Petitioners utilized the cash receipts and disbursements method of accounting to report their income for the 1976 taxable year. On January *483 1, 1975, Almo Hotel Company, Ltd. (Almo), a California limited partnership, was formed. Petitioners' respective interests in Almo's profits and losses were as follows: Jerome S. Moss
general partner
50%
Sharon M. Alesia
limited partner
25%
Herb Alpert
general partner [4]
25%
David A. Alpert, brother of petitioner Herb Alpert, also was a general partner of Almo. Although he did not have any interest in partnership profits or losses, the Almo partnership agreement provided that David A. Alpert had full authority to bind the partnership pursuant to contract. During the taxable year at issue, Almo was the sole fee owner of a hotel (the hotel) located at 6225 West Century Boulevard, Los Angeles, California, near the Los Angeles International Airport. Prior to Almo's formation, the hotel was *484 owned solely by Almo Enterprises, a California limited partnership, which had purchased the hotel in 1967 at a cost of $12,600,000. The partners of Almo Enterprises were petitioners Jerome S. Moss, Sharon M. Alesia, and Herb Alpert, and their respective partnership interests were identical to their partnership interests in Almo. The hotel was constructed in 1963 and since it opened has operated as a major business hotel in the Los Angeles International Airport area. The hotel is a 13-story, reinforced, concrete building containing approxiately 620 guest rooms, 2 large restaurants, 2 cocktail lounges, a large ballroom with a capacity of more than 1,000 guests, more than a dozen smaller conference rooms, and numerous retail stores, which merchandise such items as men's and women's clothing, jewelry, flowers, newspapers, rental cars and gifts. Other site improvements include a 2-story, reinforced, concrete parking structure, a health club complex and a swimming pool. During the taxable year at issue and all years relevant to these cases, Almo leased the hotel under a master lease to Ariz, a California limited partnership. Ariz subleased the hotel under an operating lease to Airportel, *485 Inc. (Airportel) for management purposes. [5] Prior to August 1975, Airportel, a Florida corporation in the business of hotel management, was a wholly owned subsidiary of International Airport Hotel Systems, Inc. (IAHS). IAHS had agreed to guarantee Airportel's obligations as tenant under the terms of the operating lease, and, prior to 1975, the hotel operated under the name of the International Hotel. During the early 1970's, IAHS and Airportel suffered financial difficulties, and substantial repair work, maintenance and capital replacements were not performed on the hotel for approximately 2 or 3 years. In 1975, IAHS was released from its guarantee obligations in exchange for the transfer of all of its Airportel stock to Almo and Ariz, 70 percent and 30 percent, respectively, transferred directly to their individual partners, plus $1,950,000 in cash and promissory notes. Almo and Ariz then negotiated with several hotel *486 management concerns, including the Hyatt Corporation (Hyatt), the Hilton Corporation (Hilton), and Mr. Brian Corbell, and independent operator who ran several hotels, with respect to assuming the management of the hotel's daily operations. During their negotiations, both Hyatt and Hilton recommended that approximately $2 million of repair work and capital improvements be made, and Mr. Corbell estimated total expenditures of appoximately $600,000--$700,000. The individual partners of Almo and Ariz chose Hyatt to manage the hotel and thereafter the hotel's name was changed to the Hyatt House Hotel. An agreement (management agreement) was executed on August 13, 1975 between Hyatt and Airportel, [6] as lessee under the operating lease. Several amendments to the management agreement were executed between 1975 and 1981. As a condition to the execution of the management agreement, certain hotel repair work, improvements and capital expenditures were deemed necessary. The structure of the building and its exterior were in very good condition, and one floor, as well as rooms by the *487 pool area, had been remodeled recently. However, although the hotel remained in very good operating condition, its "tired" interior condition was plainly visible to Hyatt and petitioners. Specifically, from both a functional and aesthetic standpoint, the hotel's furnishings, fixtures and design were somewhat obsolete and required remodeling. Pursuant to the terms of the management agreement, a program of repairs and improvements was proposed by Hyatt's technical assistance services division. Hyatt bore primary responsibility for deciding the specific work to be performed, subject to the final approval of the lessee, Airportel, referred to in the agreement as "Owner" of the premises. The program of repairs and improvements was incorporated directly within the management agreement, as set forth in the relevant portions of the following provisions: RECITALS * * * G. In order to induce Hyatt to assume the management of the Existing Hotel, Owner proposes, alone or in conjunction with others, to make or cause to be made substantial repairs and improvements with respect thereto, as more fully described in Section 1.3 hereof. * * * AGREEMENT * * * 1.3 Capital Improvements.
(a) Owner agrees, *488 alone or in conjunction with others, to make or cause to be made, with respect to the Existing Hotel, capital improvements (which term, as used in this Section 1.3 and in Section 1.4 and the several subsections thereof, shall refer to (i) the refurbishing of the Existing Hotel, including any work of repair and maintenance, (ii) improvements, additions or alterations to the Existing Hotel, and (iii) the purchase and installation therein of additional personal property, including Operating Equipment and Furnishings and Eguipment) at a total cost to Owner of not to exceed the sum of $2,000,000.00 (which sum is herein referred to as the "Limit"). The "total cost" to Owner of any such capital improvements is hereby defined to include * * * (ii) the cost of all work involved in the refurbishing, improvements, additions or alterations of or to the Existing Hotel, * * *. (b) As soon as practicable, Hyatt shall submit to Owner for its approval a proposal and budget (the "Improvement Budget") setting forth, in reasonable detail, a program of proposed capital improvements, * * *. Upon approval by Owner of the Improvement Budget * * * Hyatt, as agent of and for the account of Owner, shall, with *489 reasonable diligence, cause to be prepared detailed plans and specifications designed to implement the capital improvements (the "Budgeted Capital Improvements") embodied in the Approved Improvement Budget, including detailed architectural plans and specifications (the "Architectural Plans") for the proposed capital improvements other than the New FFE and detailed plans and specifications (the "FFE Plans") for the New FFE, and shall furnish copies of each thereof to Owner for its advance approval. Such Architectural Plans and FFE Plans shall be prepared by architects, designers and other specialists selected by Owner with Hyatt's approval. * * * The management agreement also provided that Hyatt was to loan to Airportel the funds necessary to finance such repairs, maintenance work and capital improvements, up to a total cost not to exceed the $2 million limit. Due to concerns that the newly acquired Airportel stock might be subject to potential but unknown liabilities, petitioners decided to segregate the money loaned by Hyatt into a separate entity. On September 15, 1975, the individual partners of Almo and Ariz formed a joint venture, Almo/Ariz, a California limited partnership, *490 whose ownership interests were held by Almo and Ariz, 70 percent and 30 percent, respectively. Almo/Ariz was formed for the purpose of making the needed repairs and refurbishments to the hotel, and executed a nonrecourse note whereby Hyatt loaned to the partnership $2 million to finance the improvement program. On October 4, 1975, Almo/Ariz, as lessor, executed a lease agreement (FFE lease) with Alar, as successor in interest to Airportel, as lessee. The FFE lease was executed with respect to the leasing of furniture, furnishings, machinery, equipment, fixtures, leasehold improvements and other property attached to or used in connection with the hotel, as purchased through the Hyatt loan. The relevant relationships between the parties may be illustrated as follows: [See Illustration in Original] All of the entities utilized the cash receipts and disbursements method of accounting to report their income, except Airportel, which used the accrual method. The repairs and capital improvements required by the management agreement were commenced in November 1975 and were completed in 1976. Four hundred of the hotel's 620 guest rooms were remodeled completely. The complete remodels included *491 both a so-called hard remodel, the replacement of hard goods, specifically furniture (beds, chairs, tables and lamps), and a so-called soft remodel, the replacement of soft goods, such as the carpeting, drapes and bedspreads. At the same time, the guest rooms were gutted, repainted and newly wallcovered. Additionally, public areas of the hotel were upgraded. Two hotel restaurants and a bar were remodeled, as were the first floor lobby and second floor ballrooms and meeting rooms. New supplies were acquired bearing the Hyatt logo on hotel signs, uniforms, folios, dishes, glassware, and linens. Almo/Ariz capitalized the following improvements financed by the Hyatt loan: Capital Improvement
Cost
Electric "Hyatt House" sign
$ 58,278
Carpeting
251,692
Drapes
178,288
Hotel furnishings
696,510
Dining and kitchen furnishings
297,562
Office equipment
4,585
Total
$1,486,915
Almo/Ariz reported repairs and depreciation expenditures financed by the Hyatt loan as follows: 1975
1976
Repairs and Maintenance
$132,140
$270,268
Depreciation
1,452
109,185
In May 1977, Almo/Ariz transferred to Airportel all of the capital improvements financed by the Hyatt loan pursuant to the management agreement, and thereafter Airportel *492 claimed depreciation deductions with respect to these items. In the statutory notices of deficiency, respondent determined deficiencies in petitioners' 1976 Federal income taxes based on Almo/Ariz's $270,268 deduction for repairs and maintenance work, which respondent determined to be expenditures pursuant to a plan of capital improvements. Each petitioner's deficiency computation was derived from its respective flow-through partnership interest in Almo, based on Almo's 70-percent partnership interest in Almo/Ariz. OPINION The sole issue for decision is whether respondent has properly disallowed deductions claimed by Almo/Ariz and reported by petitioners based on their respective partnership interests in Almo. Petitioners have deducted certain expenses attributable to hotel repairs as ordinary and necessary business expenses. Respondent has determined that the expenses must be capitalized pursuant to a plan of capital improvements. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). In the 1975 [7] and 1976 taxable years, Almo/Ariz incurred substantial expenses for repairs, maintenance work and capital improvements to remodel and refurbish *493 the Hyatt hotel owned by petitioners. All expenses were incurred pursuant to the management agreement executed between Hyatt and Airportel, and were financed by the $2 million loan from Hyatt to Almo/Ariz. The accountant for Airportel and Almo/Ariz reviewed the invoices received with respect to all of the work performed in accordance with the improvement program and classified the expenses as either repairs deductible under section 162, [8] totaling approximately $400,000, or capital expenditures under section 263, [9] *494 totaling approximately $1,500,000. [10]
The classification of expenses as either deductible repairs or capital expenditures is a question of fact that is often difficult to determine. Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 337 (1962). Generally, repairs are incidental expenses that keep property in its ordinarily efficient operating condition but neither materially add to its value nor appreciably prolong its life. Section 1.162-4, Income Tax Regs.; Bloomfield Steamship Co. v. Commissioner,33 T.C. 75, 84-85 (1959), affd. per curiam 285 F.2d 431 (5th Cir. 1961); Jones v. Commissioner,24 T.C. 563, 568 (1955), affd. 242 F.2d 616 (5th Cir. 1957); Illinois Merchants Trust Co. v. Commissioner,4 B.T.A. 103, 106-107 (1926). In comparison, capital expenditures put property into suitable operating condition and include permanent improvements or betterments and amounts expended in the restoration of property. Capital expenditures *495 add to the property's value, substantially prolong its useful life or adapt it to a new or different use. Examples of capital expenditures are costs of furniture, fixtures and similar property having a useful life substantially beyond the taxable year. Section 1.263(a)-1, -2, Income Tax Regs. In the instant case, the parties have stipulated that the particular items deducted by Almo/Ariz as repairs "were of the type (i.e., painting, wallcovering, etc.) of items that normally qualify as repair expense items." [11] *496 Consequently, petitioners have not introduced evidence with respect to the specific items that were deducted as repairs. Therefore, the issue here is more narrowly stated as whether certain expenses that normally would qualify as deductible repairs must be capitalized because they were incurred pursuant to an overall plan of capital improvements. It is well established that expenses incurred as part of a plan of capital improvements, such as a plan of rehabilitation, remodeling or renovation, must be capitalized as part of the plan, even though these same expenses would have been deductible if they had been incurred in isolation or merely as periodic repairs. Cowell v. Commissioner,18 B.T.A. 997, 1002 (1930), cited in Bloomfield Steamship Co. v. Commissioner,33 T.C. at 84; Jones v. Commissioner,24 T.C. at 568; California Casket Co. v. Commissioner,19 T.C. 32, 38 (1952). [12] The determination of whether expenses are to be capitalized pursuant to a plan of capital improvements is a question of fact. United States v. Wehrli,400 F.2d 686, 690 (10th Cir. 1968); Home News Publishing Co. v. Commissioner,18 B.T.A. 1008, 1010 (1930). Among the factors to be considered are the purpose, nature, extent, value and effect of the work performed. Oberman Manufacturing Co. v. Commissioner,47 T.C. 471, 482 (1967); Bloomfield Steamship Co. v. Commissioner,33 T.C. at 84. *497 [13] We find that, based on an analysis of these factors, a general plan of capital improvements was in effect during the taxable year in issue, specifically, for the renovation, remodeling and improvement of the hotel. The purpose underlying the program of expenses was to perform work deemed necessary by petitioners and Hyatt as a result of Airportel's and IAHS's failure to repair, maintain and perform capital improvements for approximately 2 to 3 years during the early 1970's. Even though the hotel had remained in good operating condition, its "tired" condition was plaintly visible. Its furnishings, fixtures and design were obsolete and required remodeling both from a functional and aesthetic standpoint. Petitioners and Hyatt agreed that substantial work was necessary. As a condition to the execution of the Hyatt management agreement in 1975, an extensive program of repairs and *498 improvements was to be implemented during 1975 and 1976 as financed by a loan from Hyatt. The importance of this program of improvements is illustrated in the testimony of Mr. Hugo Friend, who in 1975 was president, director and chief executive officer of Hyatt. At trial, Mr. Friend testified that the terms of this particular management agreement were "a little bit unique" in that Hyatt usually did not advance the funds necessary to finance repairs and improvements. He testified that "[i]n this case it was necessary to get the contract." The management agreement required the completion of "substantial repairs and improvements," as set forth in the agreement as "capital improvements." Capital improvements are referred to therein as refurbishing, which specifically includes repairs and maintenance, as well as improvements, additions and alterations to the hotel. The agreement clearly provides for a single and complete program of improvements, which includes expenditures for work that standing alone otherwise might qualify as deductible repairs and maintenance. The nature and extent of the work performed also is in accordance with a plan of renovation and remodeling. Virtually all of *499 Hyatt's $2 million loan was spent, with approximately $1,500,000 for capital improvements and $400,000 for repairs and maintenance. Mr. Friend testified at trial that, due to the previously postponed maintenance of the hotel in the early 1970's, the amount of total expenditures necessary was "on the high side." The specific details of the improvement project were designed by Hyatt's technical assistance services division and encompassed work to a substantial portion of the hotel. The work included the complete remodeling of 400 of the hotel's 620 guest rooms and the upgrading of public areas, such as the hotel lobby, second floor ballrooms and meeting rooms, two restaurants and bar. The particular items deducted as repair expenses, for example, for painting and wallcoverings, were pursuant to this general scheme of improvements. Although improvements were not made to the hotel's structure, the useful life of the capital improvements was anticipated to be approximately 3 to 5 years. The plan of improvements doctrine requires that the entire cost of all the expenses must be capitalized. The effect of this plan of improvements was to increase the value of the hotel property. Even *500 though the hotel always enjoyed high ratings, and the improvements did not constitute a change in use, the hotel's overall condition was upgraded as a result of the improvement project. Following the completion of this work, hotel occupancy rates increased as did room rates. This may be attributable in part to generally improved economic conditions and the cyclical nature of the hotel industry. However, the hotel's newly acquired four-star rating in 1978 is evidence that as a Hyatt hotel the value of the property did increase within the hotel industry. Petitioners cite two cases in which this Court held for the taxpayers that certain repair expenses were deductible because there were no plans of capital improvements, Keller Street Development Co. v. Commissioner,37 T.C. 559 (1961), affd. in part and revd. in part on another issue 323 F.2d 166 (9th Cir. 1963), and Kaonis v. Commissioner,T.C. Memo. 1978-184, affd. in an unpublished opinion 639 F.2d 788 (9th Cir. 1981). We note that the appellate court did not provide any discussion of the issue for decision here in either of these cases. However, because both of these cases were appealed to the Court of Appeals for the Ninth Circuit, *501 to which this case would be appealable, we set forth our reasons to distinguish these cases from the instant case. In Keller, this Court held that capital improvements made to the taxpayer's brewery to increase its productive capacity did not constitute a "general betterment program." 37 T.C. at 568. The decision was based on the fact that the brewery was in good operating condition and use as of the taxable year in issue and during several prior years. The taxpayer had begun to modernize its plant and facilities during the middle of World War II and continued to do so until 1952. In the instant case, although the hotel may have been in good operating condition in 1975, substantial repair work, maintenance and capital improvements had not been performed for the prior 2 or 3 years, and its "tired" condition was plainly visible. Petitioners and Hyatt agreed that the hotel's furnishings, fixtures and design were obsolete and required remodeling. An improvement program was developed and encompassed extensive work with respect to a substantial portion of the hotel. The remodeling work improved the hotel's condition both aesthetically and functionally. In Kaonis, this Court held that *502 the repairs performed by the taxpayer merely restored the property to its prior condition but did not add to its value nor prolong its life. We concluded that because the rental property was tenantable and generally suitable for use in the taxpayer's trade or business the repairs were not part of a "plan of total rehabilitation." 37 T.C.M. 792, 796, 47 P-H Memo T.C. par. 78,184 (1978). In the instant case, the painting, wallcoverings and other repairs were merely incidental to a $2 million improvement project, which substantially upgraded the overall condition of the hotel. The capital improvements for remodeling were estimated to have a useful life of approximately 3 to 5 years, which added to the life of the hotel property. Furthermore, although the hotel may have been generally suitable for use as a hotel, its condition as of 1975 clearly was not suitable to petitioners and Hyatt, who, as a condition to the execution of the new management agreement, reguired substantial repairs and capital improvements. We also note that the work performed made the hotel better suited for the purposes for which it was used and, specifically, better suited for its new management concern, Hyatt. *503 [14] Therefore, here the repairs, maintenance and capital improvements clearly added to the value of the property.
We reject petitioners' argument that the repair work merely was consistent with the hotel's ongoing program of repairs and maintenance. It has been established that substantial work had been deferred during the years prior to management of the hotel by Hyatt. Petitioners' argument that the 1975-1976 expenditures were consistent with expenditures incurred annually from 1977 through 1984 also tends to indicate that such expenses are more consistent with Hyatt's management style and recommendations, rather than any such ongoing program of petitioners. It should be noted that our findings here do not suggest, as petitioners contend, that regular, annual plans of maintenance and repairs necessarily constitute plans of capital improvements, absent a showing of actual work performed of the scope and magnitude of the improvements, renovations and remodeling as are present in the instant case. Finally, we note that petitioners have failed to provide authority for their *504 argument on brief that a plan of capital improvements requires creation of a "new asset." Accordingly, Decisions will be entered for respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Sharon M. Alesia, docket No. 5572-82, and Herb Alpert and Lani Alpert, docket No. 5573-82.↩
2. Petitioner Sharon M. Alesia does not contest the two other adjustments determined by respondent in the notice of deficiency issued to her based on (1) the disallowance of a depreciation deduction in the amount of $5,570 and (2) the decrease of erroneously included income in the amount of $7,422. 3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. In their requested findings of fact, petitioners proposed that Herb Alpert was a limited partner and respondent proposed that he was a general partner, but neither party objected to the other's requested finding. Our finding is based on the parties' stipulation that Herb Alpert was a general partner, which is supported by Almo's 1976 Federal partnership return that stated that he was not a limited parnter.↩
5. At trial it was stated that prior to 1975 the hotel was leased by Almo Enterprises to Airportel under a triple-net lease. In any event, we find that the hotel owners, Almo or Almo Enterprises, were not obligated to make repairs or capital improvements prior to 1975.↩
6. Certain exhibits refer to an entity known as Alar Corporation, which is a successor in interest to Airportel.↩
7. Respondent did not determine any deficiencies with respect to petitioners' Federal income taxes in the 1975 taxable year, so that any expenses incurred in that year are not at issue in these cases. ↩
8. Section 162 provides, in part, as follows: TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
9. Section 263 provides, in part, as follows: CAPITAL EXPENDITURES. (a) General Rule.--No deduction shall be allowed for-- (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * 10. Respondent does not contest Almo/Ariz's additional deduction of approximately $100,000 as ordinary and necessary business expenses for hotel kitchen and office supplies, such as dishes, glasses, and paper goods.↩
11. This stipulation is somewhat confusing, as it also states that repondent does not concede that the usage of the term "repair(s)" is intended as a concession that such expenses do in fact meet all of the requirements of a deductible repair expense. Furthermore, respondent specifically states that he preserves his argument that these repairs do not constitute repairs and maintenance that keep the hotel in an ordinary and efficient operating condition. However, given our ultimate findings we do not address this issue.
12. See also Bane v. Commissioner,T.C. Memo. 1971-31, affd. per curiam (7th Cir., July 7, 1972); 4A J. Mertens, Law of Federal Income Taxation, sec. 25.56, at 217 & 221↩ nn. 22-28 (1985 rev.).
13. See also Seahill Co. v. Commissioner,T.C. Memo. 1964-56; Bank of Houston v. Commissioner,T.C. Memo. 1960-110↩.
14. See Seahill Co. v. Commissioner,T.C. Memo. 1964-56, and Bank of Houston v. Commissioner,T.C. Memo. 1960-110↩.